[No. 49832-6.   En Banc.   June 28, 1984.]

THE STATE OF WASHINGTON, *Respondent*, v. GORDON JAMES REED, *Petitioner*.

*Don W. Taylor* (of *Fristoe, Taylor & Schultz, Ltd., P.S.*), for petitioner.

*Jeff Campiche, Prosecuting Attorney,* and *Jeremy Randolph, Special Appeals Deputy,* for respondent.

ROSELLINI, J.—Once again this court confronts the difficult task of evaluating the effect that misconduct on the part of a young, zealous prosecutor has upon the rights of the defendant. Here, highly emotional appeals to jury prejudice, as well as improper expressions of personal belief, force us to reverse petitioner's conviction so that petitioner's unconditional right to a fair trial is preserved.

I

Petitioner, Gordon James Reed, stands convicted of first degree murder for the slaying of his wife. He has never denied committing the act but asserts that extreme intoxication, combined with borderline personality disorders, prevented him from forming a premeditated intent to kill his wife.

The basic facts of the crime are relatively undisputed. Petitioner and his wife, Anola Reed, led a seminomadic life for most of the time they were together. One, or both of them, drank frequently and worked less so. During these years, the couple had four children, the oldest of whom was 5 at the time of Anola's death.

At the time of the killing, the family was living in Raymond, Washington. Both Gordon and Anola were out of work. The record established that on at least two occasions, petitioner beat his wife. The last incident occurred on February 19, 1981. As a result of this incident, petitioner was charged with simple assault and ordered to stay away from the Reed residence. Anola commenced dissolution proceedings, and a male friend, Bill Templet, moved into the house. Anola and petitioner then reconciled and petitioner returned to the home. Prior to the reconciliation, however,

petitioner repeatedly made statements about killing Anola.

On April 23, 1981, Anola and her youngest child went to Aberdeen, met Bill Templet, and went to a minister. The three other children remained with petitioner, who spent the greater portion of that day drinking and playing pool. He testified that he expected Anola to return around 3 p.m. Anola returned home around 6 p.m.

Petitioner was seen leaving the home at 6:30 p.m. and arrived at the downtown Seattle police station early the next morning, where he instructed his daughter, then 4 years old, to tell the police that he had killed her mother. After a confirming call to the Raymond police, petitioner was arrested. A blood alcohol test done at 3:10 a.m. on the 24th showed a blood alcohol reading of .05.

At trial, petitioner testified that immediately before the incident, his wife had told him that the minister advised her to "go to Bill." Petitioner testified that the next thing he remembered after her telling him this was his son screaming "killed Mommy." Petitioner testified that when he came to, he was covered with blood and his wife was dead.

Regarding his intent, petitioner insisted that he at no time intended to kill or harm Anola.

At trial, a defense witness testified that petitioner would have to have had a minimum blood alcohol content of between .17 and .21 at the time of the crime, in order to have a .05 reading at 3:10 a.m. This testimony was consistent with the State's witness, who observed petitioner at 5:45 p.m. and noted that he was "Extremely intoxicated. Could barely walk without holding on to some support." Report of Proceedings, at 244–45.

The defense also called two psychiatrists who, having examined petitioner, concluded that the combined effects of alcohol and petitioner's borderline personality disorders indicated that the petitioner did not plan to kill his wife. The State's rebuttal witness denied that petitioner had a personality disorder and denied that the consumption of alcohol "in any way interfere[s] with your ability to intend

to do something". Report of Proceedings, at 894.

During closing arguments, the prosecutor, Jeff Campiche, attacked directly the diminished capacity defense. Among his comments are the following:

MR. CAMPICHE: If it please the Court, members of the jury, Mr. Taylor said he was irritated, and I submit to you that he is eloquent. Mr. Taylor didn't irritate me. He educated me. It's quite an experience to try a case with a gentleman like Mr. Taylor, specially somebody as eloquent as he is. *If I irritated him, it is probably because I had all the goods. It must be very difficult to represent somebody like Gordon Reed when you don't have anything.* . . . Let me do that again. Logic. You have A, and you take A and B and you get to C, a conclusion. The doctors have all their experience, their background. That's B. They asked Mr. Reed about the incident itself, and he tells him something. So you've got A, you've got B and you have got C, a conclusion. *But since A is a liar, this guy couldn't tell the truth under torture. He has no idea what it is.* . . . In all their experience, they're gentlemen. They really are. Dr. Kaufman, I can't imagine spending a more pleasant afternoon with somebody. He looked very bad at the end of cross examination. *I think a lot of his—his education and stuff—we've got education down here in the woods. I've got that many years of education and 3 more.* But his (cleared throat) and *he's been published a lot. In the Supreme Court, I've been published, but I'm not going to take your job away from you jurors. He has no more ability to tell you what Gordon Reed intended on the day of the crime than the detective.* . . . *Are you going to let a bunch of city lawyers come down here and make your decision? A bunch of city doctors who drive down here in their Mercedes Benz?*

MR. TAYLOR: I object to the comment and move it be stricken.

. . .

MR. CAMPICHE: *If you think those comments are a little disparaging, it was done for a purpose. Just like much of all trial lawyers do—to shock you and make you think about that.* Those doctors have to base what they say upon Gordon Reed, *and he is a liar. He's a manipulator.* We proved that beyond any doubt at

all. . . . All the stuff about who was a good housekeeper or not was designed for one purpose. To show you beyond any doubt, to convince you absolutely, that he's a liar. Let's assume she was a bad housekeeper and she was promiscuous. *Who appointed this guy as executioner? Not this jury.* Then, he suggests to you that when he did this heinous crime in front of his children, that proves it's manslaughter. *We ought to re–enact the death penalty just for this guy for doing that.*

. . .

. . . *They're telling you what they thought, but based on the lies of Gordon Reed. . . .*

. . .

. . . How many times in 15 minutes did Gordon Reed form the intent to kill her? Premeditated. It says that any time, however long or short, that you form an intent to kill. If he had stopped stabbing her after he had stabbed her in the back, she'd be alive. How long is 5 minutes. Give him the complete benefit of doubt. I'm going to kill you, Anola. I want to kill you. I'm going to kill you. I'm going to punish you and kill you.

MR. TAYLOR: I'm going to object—
MR. CAMPICHE: I'm going to kill you—
MR. TAYLOR: —to this—
COURT: The objection is overruled.
MR. CAMPICHE: I'm going to kill you.

. . .

. . . Then, the final—the final insult to Anola Reed came from the eloquence of Don Taylor. *The final insult to that poor woman, because Gordon Reed doesn't have her around any more, it should be manslaughter. Whew! That is like out of Captain Marvel. . . .* The kids told you he hit her with the chair, and then he stabbed her. He knowingly assaulted her with a weapon or instrument likely to cause harm. *He's a cold murder two. It's cold. There is no question about murder two.*

MR. TAYLOR: I move to strike.
COURT: He is expressing an opinion and it's stricken.

(Italics ours.) Report of Proceedings, at 979–88.

Defense counsel repeatedly objected, moved to strike and for a mistrial. Each of the objections (except the one referring to "I'm going to kill you") were sustained but the motions for mistrial were denied.

The jury returned a verdict of first degree murder and petitioner appealed, alleging prosecutorial misconduct. In an unpublished opinion, Division Two agreed that the prosecutor had exceeded the proper bounds of argument, but concluded that the comments did not deny petitioner a fair trial. We granted review, and reverse. *State v. Reed,* 35 Wn. App. 1036 (July 29, 1983), *review granted,* 100 Wn.2d 1017 (1983).

## II

The sole issue in this case is whether the comments of the prosecuting attorney denied petitioner a fair trial.

To answer this question, we must first determine that the comments are in fact improper. If they are improper, we must consider whether there was a "substantial likelihood" that the comments affected the jury; for, although the Sixth Amendment and Const. art. 1, § 22 grant defendants the right to trial by an "impartial jury", the right does not include a right to an error–free trial. *State v. Latham,* 100 Wn.2d 59, 66, 667 P.2d 56 (1983).

No one, not even the prosecutor, questions the impropriety of these comments. The Code of Professional Responsibility, DR 7–106(C)(4), states unequivocally that an attorney shall not

> Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.

Applying the predecessor to this rule, this court has noted that it is just as reprehensible for one appearing as a public prosecutor to assert in argument his personal belief in the accused's guilt. *State v. Case,* 49 Wn.2d 66, 298 P.2d 500 (1956). Here, the prosecutor clearly violated CPR DR 7–106(C)(4) by asserting his personal opinion of the credibility of the witness and the guilt or innocence of the accused. First, he called the petitioner a liar no less than four times. Next, the prosecutor stated that the defense

counsel did not have a case, and that the petitioner was clearly a "murder two". Finally, he implied that the defense witnesses should not be believed because they were from out of town and drove fancy cars.

These statements suggest not the dispassionate proceedings of an American jury trial, but the impassioned arguments of a character from Camus' "The Stranger".[1]

Having made these statements—presumably to influence the jury—counsel now asserts that the comments are not as offensive as alleged and were not listened to by the jury. Respondent's novel theory of closing argument is reflected below:

> It is important to place this issue in its proper context and step back and look at it realistically. Most seasoned trial lawyers will admit that arguments of counsel are more for the benefit of the person presenting the argument than the person listening. It would be nice if great arguments could affect jury verdicts, but that seldom, if ever, is the case in modern trials. Closing arguments serve primarily as a cathartic to counsel to give self assurance that they have done everything possible for their client.

Brief of Respondent, at 3.

Respondent's statements reflect, at best, a crude understanding of trial advocacy. At worst, these statements illuminate an inexcusable ignorance of a prosecutor's proper role in our legal system.

In *State v. Case, supra* at 70–71, we quoted with approval the following description of that role:

> The responsibility of the prosecutor in the matter of a fair trial is referred to in *People v. Fielding* (1899), 158 N. Y. 542, 547, 53 N. E. 497, 46 L. R. A. 641, in these words:
>
> "Language which might be permitted to counsel in summing up a civil action cannot with propriety be used

---

[1] In "The Stranger", the hero is convicted of murder and sentenced to death, in part, because the prosecutor accused him of immorality because he did not cry at his mother's funeral. Although the dramatics of the prosecutor here were more relevant to the facts of the case, they were hardly less prejudicial.

by a public prosecutor, who is a *quasi*-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment."

Our view of a prosecutor's responsibilities is not of recent vintage. As early as 1909, Washington courts were characterizing it as the "safeguards which the wisdom of ages has thrown around persons accused of crime". *State v. Montgomery,* 56 Wash. 443, 447, 105 P. 1035 (1909). Prosecutors were reminded, then, as now, that they were public officers whose "devotion to duty is not measured, like the prowess of the savage, by the number of their victims." *Montgomery,* at 447–48.

While the Court of Appeals recognized the clear impropriety of these comments, it concluded that no prejudice resulted from them. We disagree. Petitioner's sole defense theory was that he could not form the prerequisite, premeditated intent to kill his wife. The prosecutor's comments struck directly at the evidence which supported petitioner's theory by appealing to the hometown instincts of the jury. He emphasized the fact that petitioner's counsel and expert witnesses were outsiders, and that they drove expensive cars. Each of these statements was calculated to align the jury with the prosecutor and against the petitioner.

Moreover, the State's evidence that petitioner deliberately intended to kill his wife was not, contrary to the State's assertion, overwhelming. Petitioner's admittedly severe intoxication, combined with psychiatric testimony of personality disorders, suggests a plausible theory that petitioner did not, at the time he committed the act, intend to kill his wife. We conclude, therefore, that there was a substantial likelihood that these comments affected the jury's

decision.

Because the prosecutor's comments reflect a grievous departure from the sentiments reflected above, and because there was a substantial likelihood that these comments affected the jury, we reverse.

WILLIAMS, C.J., STAFFORD, BRACHTENBACH, DOLLIVER, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

UTTER, J. (concurring)—I concur in the result reached by the majority and in the reasoning used to reach that result. I specially concur only to add that, based upon the comments of the prosecutor at oral argument, it is apparent he now appreciates the impropriety of his comments and that such conduct, in all probability, will not reoccur.