[No. 53556–6.   En Banc.   May 26, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. KERMIT A. BELGARDE, *Petitioner.*

*Kermit Belgarde,* pro se, and *Mark W. Muenster* of *Washington Appellate Defender Association,* for petitioner.

*Michael E. Rickert, Prosecuting Attorney,* for respondent.

PEARSON, C.J.—Kermit Belgarde challenges his convictions for first degree murder and attempted first degree murder. Belgarde contends that prosecutorial conduct during closing arguments deprived him of a fair trial. We agree and reverse the convictions.

On the evening of March 22, 1984, Kermit Belgarde, Joe Williams, and Williams' young nephew, Sam Bright, visited the home of James Pape and Joanne Nunn. Sam Bright

was asked to and did leave the house, but an argument ensued among the adults which culminated in the shooting of Pape and Nunn. Nunn died instantly; Pape survived. Pape and Williams testified that Belgarde did the shooting. Belgarde denied this and testified Williams shot the couple.

Five witnesses testified that on the evening of the shootings, Belgarde told them he had shot a couple of people. Three of the witnesses talked with police the next day, but two others did not tell the police their stories for approximately 3 weeks after the shootings. The latter two explained their delay in coming forward by saying that Belgarde had threatened to use AIM (American Indian Movement) against them. Belgarde admitted speaking with the witnesses who claimed to have heard his confessions on the night of the shootings, but denied the confessions and at trial attempted to show they were lying to protect Joe Williams. Each of the five witnesses were in some manner related to Williams. The witnesses were Williams' sister and her husband, Williams' niece and her husband, and Williams' nephew.

The defendant testified that he had some affiliation with the American Indian Movement which he described as a group organized to protect Indian rights. During closing argument, the prosecutor[1] made the following remarks:

> AIM—I didn't want to come in because of AIM—he said he was strong in it. They get even with people. She was scared of what he might do or what his friends might do. . . . *What is AIM? Sean Finn is the political wing of the Irish Republican Army. AIM is to the English what the Sean Finn is to the Irish. It is a deadly group of madmen.* I'm not saying all of them but that's the way they think of it. *Kadafi—feared throughout the world. Why? We don't trust his stability.* We don't' think [Jane Doe], all four foot three of her, and [John Doe], who is a lot bigger, wanted to spend the rest of their lives looking over their shoulders. Nobody deserves to have to go through that. We don't in our homes. They don't up on the reservation. In the proceedings Mr. Bisagna [defense

---

[1]The State is represented by different counsel on appeal.

counsel] says, "Well, I'm an Indian. I'm not afraid of AIM." Well, that's fine. Mr. Bisagna doesn't have an occupation of picking up cans. Mr. Bisagna doesn't live on the reservation. Mr. Bisagna isn't about four foot three inches tall. She was frightened.

. . .

. . . AIM—the people are frightened of AIM. . . . *I remember Wounded Knee, South Dakota. Do any of you? It is one of the most chilling events of the last decade. You might talk that over once you get in there. That was the American Indian Movement. That was a faction of the American Indians that were militant, that were butchers, that killed indiscriminately Whites and their own.* That event didn't end for some six years before all the court battles were done. *Is AIM something to be frightened of when you are an Indian and you live on the reservation? Yes it is.*

(Italics ours.)

The Court of Appeals, citing *State v. Claflin,* 38 Wn. App. 847, 690 P.2d 1186 (1984), *review denied,* 103 Wn.2d 1014 (1985) recognized that "[m]ere appeals to jury passion and prejudice, as well as prejudicial allusions to matters outside the evidence, are inappropriate." *State v. Belgarde,* 46 Wn. App. 441, 448, 730 P.2d 746 (1986), *review granted,* 108 Wn.2d 1002 (1987). However, the Court of Appeals held that because defense counsel had failed to object to the prosecutor's remarks, the issue was not appropriately raised on appeal.

■ Given the undisputed fact that no objection was made, the issue becomes whether any curative instructions would have effectively erased the prejudice. Appellate review is *not* precluded if the prosecutorial misconduct is so flagrant and ill intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct. *State v. Dunaway,* 109 Wn.2d 207, 221, 743 P.2d 1237 (1987); *State v. Charlton,* 90 Wn.2d 657, 661, 585 P.2d 142 (1978); *State v. Case,* 49 Wn.2d 66, 74–75, 298 P.2d 500 (1956); *State v. Claflin, supra* at 849 n.2. These inflammatory comments were a deliberate appeal to the jury's passion and prejudice and encouraged it to render a verdict

based on Belgarde's associations with AIM rather than properly admitted evidence. The remarks were flagrant, highly prejudicial and introduced "facts" not in evidence.

A prosecutor cannot be allowed to tell a jury in a murder case that the defendant is "strong in" a group which the prosecutor describes as "a deadly group of madmen", and "butchers that kill indiscriminately". The prosecutor likened the American Indian movement members to "Kadafi" and "Sean Finn" of the IRA. This court will not allow such *testimony*, in the guise of argument, whether or not defense counsel objected or sought a curative instruction. An objection and an instruction to disregard could not have erased the fear and revulsion jurors would have felt if they had believed the prosecutor's description of the Indians involved in AIM. This court cannot assume jurors did not believe the prosecutor's description. We have repeatedly explained that the question to be asked is whether there was a "substantial likelihood" the prosecutor's comments affected the verdict. *State v. Reed,* 102 Wn.2d 140, 147–48, 684 P.2d 699 (1984); *State v. Charlton, supra* at 664. There is a substantial likelihood this egregious departure from the role of a prosecutor did affect the verdict. "If misconduct is so flagrant that no instruction can cure it, there is, in effect, a mistrial and a new trial is the only and the mandatory remedy." *State v. Case, supra* at 74.

The prosecutor's argument invited the jury to return to the jury room and discuss Wounded Knee. A prosecutor has no right to call to the attention of the jury matters or considerations which the jurors have no right to consider. *State v. Case, supra* at 71. Not only did the prosecutor say the defendant belonged to a group of butchers and madmen who killed indiscriminately, but in so doing he also testified as to *facts* outside the record. He told the jury that AIM was a "deadly group of madmen", "the people are frightened of AIM", and that AIM is "something to be frightened of when you are an Indian and you live on the reservation". The defendant described AIM as a group organized to protect Indian rights. The prosecution's statements that AIM

is a group of terrorists (which he based on his own memory of the events at Wounded Knee) constituted not argument, but testimony refuting the defendant's description.

The State argues that such information is relevant because two of Mr. Williams' relatives, who testified against the defendant, explained their delay in coming forward by expressing a fear of AIM. The defendant's defense was that the other person present, Mr. Williams, had done the shooting. The five witnesses who testified against the defendant regarding his confessions were all relatives of Mr. Williams. Two of those witnesses had waited weeks before coming forward, and the explanation given was fear of AIM. Belgarde attempted to impeach these witnesses by pointing out their delay in coming forward. The prosecutor in effect took the witness stand and testified about reservation Indians' perception of the American Indian Movement. This "testimony" supported the witnesses' explanation for their delay in reporting the defendant's alleged confessions and thereby supported their credibility by introduction of facts outside of the record. If the prosecution wished to put in evidence that Indians fear AIM, the vehicle was properly to present evidence to that effect. To himself "testify" as to the "madmen" and "butchers" that comprise the American Indian Movement is to deny the defendant his right to confront and cross-examine "witnesses". The prosecutor stepped far outside his proper role as a quasi-judicial officer and an advocate to give the jury highly inflammatory "information".

It is instructive to look to prior cases wherein a prosecutor's misconduct was so prejudicial as to warrant a reversal. The prosecutor's argument here is every bit as flagrant and ill intentioned as the comments made in *State v. Reed, supra; State v. Charlton, supra;* and *State v. Claflin, supra.* In *Reed,* the prosecutor called the defendant a liar, stated defense counsel didn't have a case, referred to the defendant as clearly a "murder two", and asked the jury if they were going to let city lawyers make their decision. This court reversed the conviction in *Reed* because there existed

a "substantial likelihood" the remarks affected the jury's decision. *Reed,* at 147–48. The *Reed* misconduct was mild compared to the prosecutor's arguments in this case. In *Charlton,* the prosecutor remarked briefly on the defendant's spouse's failure to testify. This court held such reference to be flagrant and ill intentioned and reversed the conviction in spite of a failure to request a curative instruction. In *Claflin,* the prosecutor read a poem by a rape victim and the conviction was reversed because no curative instruction could erase such an appeal to passion and prejudice. We likewise find that the prejudice engendered by the prosecutor's arguments regarding the American Indian Movement mandates a retrial.

This case also raises the issue of whether the prosecutor's comments on defendant's post–arrest silence violated due process. The Court of Appeals held that the prosecutor's references to defendant's silence were proper.

In closing argument the prosecutor remarked on defendant's initial silence upon arrest:

> Next item. Schmidt—*doesn't say anything* to Schmidt. Christiensen, the border patrol, *doesn't say anything* to him. Barriball, again *doesn't talk to him* except to ask what jail he is going to. This guy who was getting framed, don't you think—I would go, "But wait, I got to tell you guys something." *He doesn't say anything.* He's getting his chance but wait—Stokes in the area, Huntoon in the area, Kurhenrewther in the area, *no talking.* I ask you— who is beginning to have some doubts about Gary [Belgarde]?

(Italics ours. The named individuals are police officers.) Again in rebuttal the prosecutor highlighted Belgarde's failure to tell police his trial defense:

> Why doesn't [defense counsel] talk about his client? . . . Oh, yeah, they get a doctor here who heard the story some three weeks ago. *If you got a story and you are innocent, you tell the cops.* You don't tell some doctor.

(Italics ours.) Belgarde contends these comments penalized his exercise of the right to remain silent and denied him due process. We agree.

■ It is settled that the State may not, consistent with due process, use post–arrest silence following *Miranda* warnings to impeach a defendant's testimony at trial. *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). *State v. Evans,* 96 Wn.2d 1, 633 P.2d 83 (1981) stated at page 3:

[T]he use, for impeachment purposes, of defendant's silence following receipt of *Miranda* warnings is fundamentally unfair and therefore violates the due process clause of the Fourteenth Amendment since the giving of the warnings implicitly assures defendant that silence will carry no penalty.

Silence in the wake of such warnings is "insolubly ambiguous" and may merely reflect reliance on the right to remain silent rather than a fabricated trial defense. *Doyle,* at 617. Further, *Miranda* warnings impliedly assure that a defendant's silence will not be used against him at trial. *Doyle,* at 618.

However, once a defendant waives the right to remain silent and makes a statement to police, the prosecution may use such a statement to impeach the defendant's inconsistent trial testimony. This exception to the rule in *Doyle v. Ohio, supra,* was set forth in *Anderson v. Charles,* 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180 (1980). *Accord, State v. Seeley,* 43 Wn. App. 711, 719 P.2d 168, *review denied,* 107 Wn.2d 1005 (1986); *State v. Hatley,* 41 Wn. App. 789, 801, 706 P.2d 1083, *review denied,* 104 Wn.2d 1024 (1985); *State v. Cosden,* 18 Wn. App. 213, 568 P.2d 802 (1977), *review denied,* 89 Wn.2d 1016, *cert. denied,* 439 U.S. 823 (1978). In particular, the State may question a defendant's failure to incorporate the events related at trial into the statement given police or it may challenge inconsistent assertions. Such was the situation in *Cosden* where the defendant had not remained silent, but had uttered a denial in one form and on trial asserted a different excuse. This "partial silence" at the time of the initial statement is not insolubly ambiguous, but "strongly suggests a fabricated defense and the silence properly impeaches the later

defense." *Cosden,* at 221. Such questioning does not violate due process as the defendant has waived the right to remain silent concerning the subject matter of his statement. *Anderson,* at 408.

We do not find the prosecutor's comments were proper under *Anderson* and *Cosden.* In both cases, the State was allowed to question the defendant's partial silence at the time he made a statement to police, after having waived the right to remain silent, in order to impeach the defendant's inconsistent trial testimony. In the instant case, the prosecutor focused not on any prior inconsistent statements made by the defendant, but on his *failure* to make a statement immediately upon arrest. Although the prosecutor commented on Belgarde's prior inconsistent statement in other portions of closing argument, the challenged remarks specifically refer to the officers present when Belgarde was first apprehended. The prosecution's remarks which focused on the defendant's exercise of his right to remain silent falls directly under the *Doyle* rule which forbids using such silence to imply guilt. We therefore disagree with the Court of Appeals and find that such comments on post–arrest silence violate due process. However, in light of the fact that the prosecutor's arguments regarding AIM require reversal, it is unnecessary to determine whether the comments on post–arrest silence constitute harmless or prejudicial error. We assume this error will not be repeated.

The convictions are therefore vacated and remanded.

UTTER, BRACHTENBACH, DOLLIVER, and GOODLOE, JJ., and PETRIE, J. Pro Tem., concur.

ANDERSEN, J., concurs in the result.

CALLOW, J. (dissenting in part, concurring in part)—Not until now has it been so clear that when prosecutors overreach in argument, defense counsel may remain mute and need raise no remonstrance against the abuse. It should now be plain to prosecutors that they can expect no clue from the defense when they are sailing into objectionable

and troubled waters. It should also now be apparent to trial court judges that they must superintend each moment of a prosecutor's argument while the defense silently notes errors to appeal in case of a conviction. The prosecutor's argument is now an area where the court must act sua sponte to stop the errant prosecutor whether defense counsel wishes it or not.

Under the majority approach, it is only when the prosecutor's wrongdoing is egregious and should be most apparent to a defense counsel that counsel need do nothing, secure in the knowledge that the appellate courts will save the defendant in the end. When the demand for action should be at its height, the exercise of the lowest standards is to be rewarded.

Lest there be any confusion left by the majority's recitation of the facts, it is appropriate to point out that the argument which ensued among the adults took place because Nunn asked the boy, Sam Bright, to leave because she had experience with him taking things. Belgarde and Williams objected to Sam Bright being sent away, saying that they were trying to reform him.

Pape testified, at the trial, that during the argument Belgarde threatened him and he ordered Belgarde to leave. Pape said that Belgarde returned moments later with a rifle and shot him. Williams also testified that Belgarde shot both Pape and Nunn. Bright stated that while waiting outside he saw Belgarde retrieve a rifle from the car and reenter the house. He heard two shots and then Williams and Belgarde emerged from the house, Belgarde still holding the rifle. Bright testified on cross examination that Belgarde had concocted a story about picking up a Cuban hitchhiker carrying a blue backpack and a rifle and had told Bright to tell that story. Bright also testified that, although he did not see the actual shooting, Belgarde further had told him not to say anything and that if he did not say anything, he would give him $5,000.

Five additional witnesses testified that on the night of the shootings, Belgarde confessed to them that he had shot

two people, specifically mentioning Pape and Nunn to several witnesses. As recounted by one witness, Belgarde stated: "I killed two people. I blew this girl's head off."

It also came out during the trial, that after arriving at the Whatcom County police station, Belgarde gave an exculpatory statement to Chief Deputy Ron Panzero of the Skagit County Sheriff's Department. At that time Belgarde denied being in Skagit County on March 22, stating that he was in Whatcom County searching for a job. At that time Belgarde told Panzero he knew Williams but had not seen him for several weeks, and that he did not know and had not shot Pape or Nunn.

Belgarde's testimony during the trial contradicted his statement to Deputy Panzero. He admitted spending the day in question with Williams in Skagit County and visiting Pape and Nunn's house that night, but he claimed that Williams shot the couple. Belgarde admitted speaking with the witnesses who allegedly heard his confessions, but he denied making such confessions and attempted to show that the State's witnesses were lying to protect Williams.

I agree with the majority that the prosecutor's comments on the defendant's post–arrest silence were improper and violated due process. Referring to a defendant's silence upon his arrest, whether the silence is before or after he has been given *Miranda* warnings, is misconduct on the part of the prosecutor and normally cause for reversal. *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976); *Anderson v. Charles,* 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180, *reh'g denied,* 448 U.S. 912 (1980); *State v. Evans,* 96 Wn.2d 1, 633 P.2d 83 (1981); *State v. Seeley,* 43 Wn. App. 711, 719 P.2d 168, *review denied,* 107 Wn.2d 1005 (1986); *State v. Cosden,* 18 Wn. App. 213, 568 P.2d 802 (1977), *review denied,* 89 Wn.2d 1016, *cert. denied,* 439 U.S. 823 (1978). However, although I concur that the prosecutor's comments were improper, the majority remands the matter for a retrial without examining the whole record to ascertain whether absent this error, the trial would result

in the same verdict. *See State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986). It appears to me that under the overwhelming untainted evidence test adopted by this court, we should determine whether the evidence is so overwhelming that it necessarily leads to a finding of guilt. *Gulóy,* at 426.

The critical issue was whether the defendant or Williams fired the shots which killed Nunn and wounded Pape as Belgarde admitted during the trial to being present when the shootings took place. Evidence of Belgarde's guilt included Pape and Williams' eyewitness accounts, Bright's testimony that he saw Belgarde enter and exit the house carrying the murder weapon just prior to and following the shots, and the testimony of five witnesses that Belgarde confessed to the shootings the same night. The State also presented expert testimony corroborating Pape and Williams' stories regarding the location from which both shots were fired which conflicted with Belgarde's version of events. The testimony of all the witnesses was credible save that of the defendant. The testimony of all of the other witnesses was consistent in general with that of each of the other witnesses save that of the defendant. The testimony of the defendant was contradicted by every other witness. I submit that the evidence was overwhelming as to the guilt of the defendant.

I agree also with the majority that the conduct of the prosecutor was improper, that he included factual recitations and personal opinion outside of the record, made inflammatory comments which were a deliberate appeal to the jury's passion and prejudice encouraging it to render a verdict based on the defendant's associations with AIM rather than on properly admitted evidence. The majority and I part company, because while the conduct of the prosecutor was flagrant, early objections by defense counsel and curative instructions could have avoided the prejudice engendered by the misconduct and the evidence of guilt is overwhelming. Most importantly, the result of the majority

is to encourage defense counsel to abandon any responsibility to object and to place a sentence by sentence supervision of a prosecutor's conduct into the hands of the trial court. This undeservedly favors the defense when the prosecution forgets its role and its duty.

A prosecuting attorney's duty is to see that an accused receives a fair trial. *State v. Charlton,* 90 Wn.2d 657, 664–65, 585 P.2d 142 (1978); *State v. Rose,* 62 Wn.2d 309, 312, 382 P.2d 513 (1963); *State v. Reeder,* 46 Wn.2d 888, 892, 285 P.2d 884 (1955). The prosecutor, in the interest of justice, must act impartially, seeking a verdict free of prejudice and based on reason. *State v. Charlton, supra; State v. Huson,* 73 Wn.2d 660, 663, 440 P.2d 192 (1968), *cert. denied,* 393 U.S. 1096 (1969). In *Charlton,* it was stated:

> In spite of our frequent warnings that prejudicial prosecutorial tactics will not be permitted, we find that some prosecutors continue to use improper, sometimes prejudicial means in an effort to obtain convictions. In most of these instances, competent evidence fully sustains a conviction. Thus, we are hard pressed to imagine what, if anything, such prosecutors hope to gain by the introduction of unfair and improper tactics.
>
> It has been thoughtfully observed that
>
> [i]f prosecutors are permitted to convict guilty defendants by improper, unfair means, then we are but a moment away from the time when prosecutors will convict innocent defendants by unfair means.
>
> *State v. Torres,* 16 Wn. App. 254, 263, 554 P.2d 1069 (1976).

*Charlton,* at 665.

In general, during closing argument a prosecutor may state the law as set forth by the court in the instructions, *State v. Mak,* 105 Wn.2d 692, 726, 718 P.2d 407, *cert. denied,* 107 S. Ct. 599 (1986), and has wide latitude to argue the facts in evidence and reasonable inferences therefrom. *State v. Mak, supra* at 698, 726; *State v. Papadopoulos,* 34 Wn. App. 397, 401, 662 P.2d 59 (1983). We have consistently held improper, however, arguments which

introduce extraneous inflammatory rhetoric, personal opinion, or facts unsupported by the record. *See State v. Reed,* 102 Wn.2d 140, 684 P.2d 699 (1984); *State v. Music,* 79 Wn.2d 699, 489 P.2d 159 (1971); *State v. Huson, supra; State v. Rose, supra; State v. Case,* 49 Wn.2d 66, 298 P.2d 500 (1956); *State v. Reeder, supra. See also State v. Claflin,* 38 Wn. App. 847, 690 P.2d 1186 (1984), *review denied,* 103 Wn.2d 1014 (1985); RPC 3.4(e)(f). Appeals to jury passion and prejudice are clearly improper. *State v. Claflin, supra.* As observed in *State v. Case, supra:*

> "Language which might be permitted to counsel in summing up a civil action cannot with propriety be used by a public prosecutor, who is a *quasi*-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment."
>
> . . .
>
> "The district attorney is a high public officer, representing the state, which seeks equal and impartial justice, and it is as much his duty to see that no innocent man suffers as it is to see that no guilty man escapes. In the discharge of these most important duties he commands the respect of the people of the county and usually exercises a great influence upon jurors. In discussing the evidence he is . . . given the widest latitude within the four corners of the evidence by way of comment, denunciation or appeal, but he has no right to call to the attention of the jury matters or considerations which the jurors have no right to consider."

*Case,* at 70–71 (quoting *People v. Fielding,* 158 N.Y. 542, 547, 53 N.E. 497 (1899)).

However, at no time during closing argument did defense counsel object or seek other corrective action from the court. To preserve improper argument as error on appeal, counsel must timely object, move for mistrial, or request a

curative instruction or admonition. *State v. Dunaway,* 109 Wn.2d 207, 221, 743 P.2d 1237 (1987); *State v. Charlton, supra; State v. Kendrick,* 47 Wn. App. 620, 638, 736 P.2d 1079, *review denied,* 108 Wn.2d 1024 (1987). The only exception to this rule exists when the misconduct is so flagrant and ill intentioned that timely objection and curative instructions could not have obviated the resulting prejudice. *State v. Dunaway, supra; State v. Charlton, supra.*

Defense counsel had ample opportunity when the prosecutor first mentioned AIM in the context of the Irish Republican Army to object and preclude any further prejudicial remarks in the same vein. I do not condone the prosecutor's conduct, but we should not allow defense counsel to purposefully remain silent during improper argument, hoping for acquittal, but reserving the benefit of an error for appeal and a possible retrial in the event the jury convicts. *See State v. Huson, supra.* The trial court is in the best position to correct such errors and entitled to an opportunity to do so.

Defendant should not now be able to argue he received an unfair trial. A timely objection by an alert and responsible defense counsel, an instruction to disregard and an admonition from the bench could have emphasized the impropriety of the prosecutor's conduct, and stopped the prosecutor from getting out of line—avoiding wasteful expense and the difficulty of a retrial. Defense counsel's silence during closing argument not only results in unnecessary appeals and costly retrials, but also jeopardizes a defendant's rights leaving his protection solely to the appellate courts.

There is precedent for the result reached by the majority. However, perhaps never before has the contrast between the unsupported and improper argument of a prosecutor and the absolute silence of a defense counsel been so clear and stark. The result reached by the majority, which I find unnecessary in view of the overwhelming evidence of guilt, sends a clear message to both prosecutors and trial judges

that prosecutors must stay within the bounds of the evidence admitted during the trial and argue the law as set forth in the court's instructions.

The result of the majority ignores the substantial evidence rule reaching its result because of the high degree of flagrant disregard of the bounds of closing argument by the prosecution. The majority does so without an examination of the evidence which supports only the conclusion reached by the jury. We said in *State v. Martin*, 73 Wn.2d 616, 627, 440 P.2d 429 (1968), *cert. denied*, 393 U.S. 1081 (1969):

> The rule is now definitely established in this state that the verdict of the jury in a criminal case will be set aside and a new trial granted to the defendant, because of an error occurring during the trial of the case, only when such error may be designated as prejudicial. . . .
> A prejudicial error may be defined as one which affects or presumptively affects the final results of the trial. . . . When the appellate court is unable to say from the record before it whether the defendant would or would not have been convicted but for the error committed in the trial court, then the error may not be deemed harmless, and the defendant's right to a fair trial requires that the verdict be set aside and that he be granted a new trial. But, where the defendant's guilt is conclusively proven by competent evidence, and no other rational conclusion can be reached except that the defendant is guilty as charged, then the conviction should not be set aside because of unsubstantial errors. . . . To determine whether prejudice has resulted, it is necessary that the appellate court examine the entire record.

In the past it has been the rule that appellate courts would review alleged misconduct only if the defense objected to the misconduct at trial and requested a corrective instruction. Prosecutors and trial courts who rely hereafter on the defense to have any responsibility to guide prosecutorial conduct delude themselves.

The majority now sends a clear message—prosecutors stray from the law and the evidence at your peril; trial judges control the prosecutor within those boundaries and expect nothing from the defense or face reversal of a guilty

verdict no matter how conclusive the proof or how meticulously conducted the trial.

I disagree with the opinion that this court does not have responsibility to review the entire record in any case of reversal to ascertain whether there is overwhelming evidence of guilt. I cannot concur in a rule which shifts the defense counsel's responsibility for correcting a prosecutor's misconduct entirely to the trial judge.

DURHAM, J., concurs with CALLOW, J.