**FILED**
**MAY 20, 2021**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37977-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MARVIN JOHN TANKERSLEY, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Marvin Tankersley challenges his convictions for animal cruelty and malicious mischief on insufficient evidence grounds. He also claims the State impermissibly commented on his right to remain silent. We reject Tankersley's contentions and affirm his two convictions.

FACTS

This appeal arises from the early morning death of the Alaskan Malamute, Kova. We take the facts primarily from trial testimony. Because we take the facts in the glow

most favorable to the State, we relate Marvin Tankersley's version of the death of Kova when we later narrate trial proceedings.

On July 16, 2017, Marvin Tankersley resided with his former, but reconciling, wife, Roberta Tankersley, her friend, Faith Johnson, and Marvin's brother-in-law. Four dogs and a cat named Tigger also inhabited the residence. Kova was one of the dogs.

Three months earlier, Marvin and Roberta Tankersley acquired Kova from a woman in Vancouver. Roberta concedes that Marvin paid for the Malamute. The seller advised that Kova treated other dogs friendly.

Cynthia Gonser, an employee at the Stevenson Veterinary Clinic, testified at trial. Gonser averred that both Marvin and Roberta Tankersley visited the veterinarian's office and expressed the desire for the office to identify both Kova and Tigger under the same account number, because the animals "were going to become both of theirs together, as they were coming together as a couple." Report of Proceedings (RP) at 181. From this conversation, the employee concluded that Kova initially belonged exclusively to Marvin and Tigger to Roberta. Now, however, the Tankersleys wished to co-own their pets. Gonser opened an account for the two pets under both Marvin and Roberta's names. Marvin and Roberta signed a joint client information sheet.

During trial, Roberta Tankersley testified that she and Marvin Tankersley jointly paid for Kova's veterinary bills. Roberta described Kova as a family dog with whom

other people in the household spent time. Kova got along well with the people and animals in the Tankersley residence and with the neighbor's children and pets.

Faith Johnson testified at trial that Kova caused no difficulties. According to Johnson, Kova belonged to "[t]he house." RP at 94. The Tankersleys' neighbor, Kevin Lueders, testified that Kova was a good dog. Lueders' two cats and ten chickens roamed outdoors, and Kova never bothered the animals. Lueders' children interacted well with Kova.

On the evening of July 16, 2019, Roberta Tankersley went to bed at 8:00 pm, after consuming Budweiser beer. Marvin Tankersley later entered the house and declared to Roberta that "he was gonna to kill the dog." RP at 119. Roberta did not deem Marvin to be serious because he also had drank alcohol that night. At some unidentified time that night, Roberta heard Kova yelping in a manner she had not heard previously.

During the night of July 16-17, 2019, Faith Johnson visited a friend at the friend's abode. At 3:46 am, Marvin Tankersley texted Johnson: "'I killed Kova, Kova is dead'" and "I will kill." RP at 98-99. Johnson did not read Tankersley's messages until she awoke at 7:00 am. She then called law enforcement on her way home.

On returning home, Faith Johnson looked for Kova, but could not find her. Under the house's porch, however, Johnson found a pool of blood. Kova typically slept under the porch. Johnson also found, inside the house, a knife with fur thereon.

Skamania County Sheriff Deputy Russ Hastings responded to Faith Johnson's call, came to the Tankersley residence, and spoke with Johnson and Roberta Tankersley. Deputy Hastings looked underneath the front porch, where he saw three areas of blood splatters. He searched the property, but could not find Kova. Hastings then searched for Marvin Tankersley.

Marvin Tankersley usually slept on the living room sofa, but had slept in his camper during the night of July 16-17, 2019. Deputy Russ Hastings found Tankersley's four-wheel-drive truck parked in the backyard near the woods. Faith Johnson testified at trial that Tankersley did not ordinarily park his truck in this location.

Deputy Russ Hastings discovered Marvin Tankersley sleeping in his camper and spoke with him. Deputy Hastings arrested Marvin Tankersley based on Roberta Tankersley's report that Marvin planned to stab and kill Kova. After being Mirandized, Tankersley stated that he no longer wanted to speak with the deputy. Tankersley also requested an attorney. Later, however, Tankersley retorted to Hastings "When this is over with and you don't find an animal, then I'm gonna walk, I'm gonna come get my stuff and I'm gonna leave." RP at 168.

One week later, neighbors Kevin Lueders and Jonathan Hayes found a dog carcass on a forest road. On July 27, 2019, Lueders and Hayes directed Sheriff Deputies Christian Lyle and Brandon Van Pelt to the carcass site. The site featured brush on both sides of the road. Law enforcement observed two parallel lines of depressed brush and

4

disturbed earth, which lines police believed a vehicle's tires caused. Deputy Van Pelt described the carcass site as "15 feet in diameter of just gray and white fur, with the carcass in the middle." RP at 139. Deputy Van Pelt characterized the site as a good place to conceal an object.

After the deputies took photographs of the dog's carcass, they returned to the Tankersleys' home. They showed the photos to Roberta Tankersley and Faith Johnson, both of whom identified the carcass as Kova. When shown one of the photos, Roberta spontaneously responded: "that's my dog." RP at 147.

PROCEDURE

As a result of the death of Alaskan Malamute Kova, the State of Washington charged Marvin Tankersley with one count of animal cruelty in the first degree and one count of malicious mischief in the third degree. On the animal cruelty count, the State alleged that Tankersley "intentionally and unlawfully inflicted substantial pain on or caused physical injury to an animal, or did kill an animal by a means causing undue suffering or while manifesting an extreme indifference to life." Clerk's Papers (CP) at 40-41.

The trial court conducted a CrR 3.5 hearing to determine whether to admit as trial evidence Marvin Tankersley's statement to Deputy Russ Hastings: "When this is over with and you don't find an animal, then I'm gonna walk." RP at 168. Deputy Hastings testified to the circumstances of the arrest of Marvin Tankersley. After Hastings read

5

Tankersley his *Miranda* rights, Tankersley replied that he did not wish to speak and that he wanted an attorney. Later, without any prompting or questioning from law enforcement, Tankersley said "something to the effect that if we didn't find the animal that he would walk." RP at 14. The trial court ruled Tankersley's voluntary statement admissible.

During trial, Marvin Tankersley testified that, while he intentionally killed Kova, he did so from mercy. Tankersley averred that, on returning home on July 16, 2019, he noticed $200 to $300 worth of recycling cans missing from his back porch. He also realized that the back door was open, even though Roberta and he normally shut the door. Tankersley suspected that a prowler purloined the cans. Thus, he stayed in his camper with a knife to surveil his property and await the suspected prowler's possible return.

According to Marvin Tankersley, he awoke to Kova barking, at which time he exited his camper with the knife. He believed that Kova might be barking at the prowler. Tankersley testified that Kova stood by the side of the camper and that he could see a person's silhouette fifty yards away near the blackberries by the side of the house. With knife in hand, Tankersley ran toward the silhouette, but lost sight of it. Kova then chased an animal on a telephone pole next to the camper's bedroom window. Tankersley realized that Kova was pursuing Tigger the cat.

During trial, Marvin Tankersley averred that he grabbed Kova by her collar. Subsequently, Tigger descended the pole. Tankersley grabbed Tigger, but Kova

6

continued to pursue the cat. Marvin ran toward Kova, but tripped and fell over a birdbath. Marvin noticed Roberta walking across the deck with Tigger in her arms, while Kova stood on his hind legs going for Tigger.

Marvin Tankersley, continuing with his narrative, averred that he grabbed Kova by the collar with his left hand before Kova knocked him into the deck's railing and onto the ground. Then he attempted to grab Kova around his underside with his right hand, forgetting that the knife lay in that hand. Tankersley accidentally stabbed Kova beneath his left shoulder. On realizing that he stabbed Kova, Tankersley knelt and removed the knife from Kova's torso. Tankersley cried and prayed. Tankersley stabbed Kova twice more in order to euthanize him and end his suffering.

After the latter two stabbings, Kova, according to Marvin Tankersley, scampered underneath the porch. Kova laid there for seconds before returning to Marvin's side and expiring. Marvin assumed Roberta Tankersley witnessed Kova's death, since she looked at Marvin when Kova expired. During trial, Roberta did not confirm Tankersley's story. According to Roberta, she learned about the death from her roommate, Faith Johnson.

Marvin Tankersley explained, during trial, that he texted Faith Johnson about Kova's death, to avoid her being surprised when returning home. Tankersley took Kova's body to the forest road, because he did not wish for his other dogs to see Kova decomposing. Tankersley wished to bury Kova, but, due to Kova's size and Tankersley's

pain, he instead slid Kova off his truck. He expected the body would decompose naturally along the side of the road.

During the State's cross-examination of Marvin Tankersley, the following exchange occurred regarding Tankersley's post-*Miranda* comment and his version of July 16, 2019's events:

> BY MR. [Patrick] ROBINSON [the State's attorney]:
> Q. It was an accident, so that's why you drove up to the middle of nowhere and left the dog so no one could find it, correct?
> A. No, sir.
> Q. It was an accident and you didn't do anything wrong, that's why you told the police about the prowler, correct?
> A. No, sir.
> Q. You didn't tell the police about the prowler, did you?
> A. No, sir.
> Q. In fact, everything you did when the police showed up was to try to hide your tracks, to try to get away with this, correct?
> A. No, sir.
> Q. And you even said to the police, if you don't find the dog, I'm gonna walk, correct, you said that?
> A. Yes, sir.

RP at 208. The prosecuting attorney's cross-examination continued:

> Q. And again, you never told the police about the prowler, correct?
> A. No, sir, I lawyered up, cuz he gave me the Miranda rights and I said I'd take the lawyer and I quit speaking.
> Q. But then you said, if you don't find the dog, I'm gonna walk, right?
> A. Yes.
> Q. Okay and you never told the police about the silhouette near the blackberries, correct?
> A. Never did.
> Q. Never told the police about anything related to Tigger and the telephone pole, correct?

> A. Correct.
> Q. Never told them about tripping on the birdbath?
> A. Nope.
> Q. Never told them about accidentally stabbing Kova, correct?
> A. Nope.

RP at 212-13. Tankersley did not object to the State's line of questioning.

Jury instruction 6 listed the elements required to convict Marvin Tankersley of animal cruelty. The instruction stated, in relevant part:

> To convict the defendant of the crime of Animal Cruelty in the First Degree, each of the following elements must be proved beyond a reasonable doubt:
> (1) That on or about or between July 16th, 2019 and July 17th, 2019, the Defendant unlawfully and intentionally:
> (a) inflicted substantial pain on an animal, or
> (b) caused physical injury to an animal, or
> (c) killed an animal by a means causing undue suffering or while manifesting an extreme indifference to life.
> . . . .
> To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (1)(a), (1)(b), or (1)(c) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

CP at 50.

The jury found Marvin Tankersley guilty of both animal cruelty in the first degree and malicious mischief in the third degree.

## LAW AND ANALYSIS

### Evidence of Animal Cruelty in the First Degree

Marvin Tankersley argues that the State presented insufficient evidence to convict

9

him of first degree animal cruelty. He combines this contention with the argument that the trial court denied him his right to jury unanimity by failing to provide a jury unanimity instruction for the first degree animal cruelty charge despite the State charging him with three alternative means to committing the crime. We conflate the two assignments of error.

RCW 16.52.205 establishes the elements of the crime of animal cruelty in the first degree. The statute declares, in relevant part:

> (1) A person is guilty of animal cruelty in the first degree when, except as authorized in law, he or she intentionally (a) inflicts substantial pain on, (b) causes physical injury to, or (c) kills an animal by a means causing undue suffering or while manifesting an extreme indifference to life, or forces a minor to inflict unnecessary pain, injury, or death on an animal.

RCW 16.52.205(1) is an alternative means statute, one that "provides different ways in or means by which the crime may be committed, all in one statute." *State v. Arndt*, 87 Wn.2d 374, 377, 553 P.2d 1328 (1976). For an alternative means crime, jury "unanimity is required as to guilt for the single crime charged, but not as to the means by which the crime was committed, so long as substantial evidence supports each alternative means." *State v. Williams*, 136 Wn. App. 486, 497-98, 150 P.3d 111 (2007). "When one alternative means of committing a crime has evidentiary support and another does not, courts may not assume the jury relied unanimously on the supported means." *State v. Woodlyn*, 188 Wn.2d 157, 162, 392 P.3d 1062 (2017).

10

The State alleged that Marvin Tankersley committed first degree animal cruelty by three alternative means: (1) unlawfully and intentionally inflicting substantial pain on an animal, (2) unlawfully and intentionally causing physical injury to an animal, or (3) unlawfully and intentionally killing an animal by a means causing undue suffering or while manifesting an extreme indifference to life. Jury instruction 6 stated that, to return a verdict of guilty, the jury needed not to be unanimous as to which of three alternatives the State had proved beyond a reasonable doubt, as long as each juror found that at least one alternative had been proved beyond a reasonable doubt. Because the trial court did not deliver a jury unanimity instruction, the State needed to provide sufficient evidence supporting each of RCW 16.52.205(1)'s alternative means. Tankersley contends that the State failed to prove any of RCW 16.52.205(1)'s three alternative means.

Whether sufficient evidence supports a defendant's conviction is a question of law reviewed de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Due process requires that the State prove each element of a charged crime beyond a reasonable doubt. U.S. CONST. amend. XIV; *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015). If, after viewing the evidence in the light most favorable to the State, this court determines that "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" this court should affirm the conviction. *State v. Tilton*, 149 Wn.2d 775, 786, 72 P.3d 735 (2003) (quoting *State v. Joy*, 121 Wn.2d 333, 338, 851 P.2d 654 (1993). By asserting insufficiency of evidence, the defendant "admits

11

the truth of the State's evidence and all inferences that can reasonably be drawn from it." *State v. Tilton*, 149 Wn.2d at 786. "Circumstantial evidence and direct evidence are equally reliable." *State v. Dejarlais*, 88 Wn. App. 297, 305, 944 P.2d 1110 (1997) *aff'd* 136 Wn.2d 939, 969 P.2d 90 (1998). "[T]he existence of a fact cannot rest in guess, speculation or conjecture." *Gardner v. Seymour*, 27 Wn.2d 802, 808, 180 P.2d 564 (1947). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

On appeal, the State initially asserts that it carried no burden to prove that Marvin Tankersley intended either the result of Kova's substantial pain or intended to kill Kova by means causing undue suffering or while manifesting extreme indifference to life. We disagree.

The State reasons that the jury was tasked, by jury instruction 6, with determining whether the result occurred, not whether Tankersley intended to cause substantial pain or undue suffering. The State relies on *State v. Andree*, 90 Wn. App. 917, 923, 954 P.2d 346 (1998), in which this court held that unchallenged jury instructions becomes the law of the case.

Jury instruction 6 does not support the State's contention. The instruction reads that, to convict Marvin Tankersley of first degree animal cruelty, the State had to prove beyond a reasonable doubt:

> (1) That on or about or between July 16th, 2019 and July 17th, 2019,

12

the Defendant unlawfully and *intentionally*:
    (a) inflicted substantial pain on an animal, or
    (b) caused physical injury to an animal, or
    (c) killed an animal by a means causing undue suffering or while manifesting an extreme indifference to life.

CP at 50 (emphasis added). The jury instruction specifically tasked the jury with determining Tankersley's specific intent not merely that specific results occurred as a result of his conduct. The jury instruction followed the language of RCW 16.52.205(1) declares, in relevant part:

A person is guilty of animal cruelty in the first degree when, except as authorized in law, he or she *intentionally* (a) inflicts substantial pain on, (b) causes physical injury to, or (c) kills an animal by a means causing undue suffering or while manifesting an extreme indifference to life, or forces a minor to inflict unnecessary pain, injury, or death on an animal.

(Emphasis added.)

We now respond to Marvin Tankersley's contention that the State failed to supply needed evidence to show he intentionally caused physical injury to an animal, intentionally inflicted substantial pain on an animal, and killed an animal by a means causing undue suffering or while manifesting an extreme indifference to life. Tankersley's own trial testimony provided sufficient evidence for the jury to find that he caused Kova physical injury. Tankersley admitted that he intentionally killed Kova by stabbing the dog twice after he accidentally stabbed Kova once.

Sufficient evidence also supports a jury finding that Marvin Tankersley intentionally inflicted substantial pain. A jury may infer specific intent when "a

13

defendant's conduct plainly indicates the requisite intent as a matter of logical probability." *State v. Stearns*, 61 Wn. App. 224, 228, 810 P.2d 41 (1991). The record contradicts Marvin Tankersley's innocent explanation surrounding Kova's death. Roberta Tankersley testified that she heard Kova yelping in a manner she had not heard previously after Marvin informed her that he planned to kill "the dog." RP at 118-19.

Marvin Tankersley's claim that Kova aggressively attacked before the dog's demise contradicts other testimony regarding the dog's behavior. Roberta Tankersley avowed that Kova mixed well with other animals. Faith Johnson averred that no one in the household had any problems with Kova. The neighbor, Kevin Lueders, testified that Kova was a good dog and never harmed his children, his two cats, or his ten chickens. Roberta Tankersley's testimony contradicts Marvin Tankersley's claim that she observed Kova assault Tigger.

When Deputy Russ Hastings arrested Marvin Tankersley, Tankersley voluntarily exclaimed to the deputy, "When this is over with and you don't find an animal, then I'm gonna walk, I'm gonna come get my stuff and I'm gonna leave." RP at 168. Tankersley's intended message was unclear, but reasonable jurors could construe the remark as contrary to Tankersley's claim of innocence, because the comment suggested that Kova was not dead.

Marvin Tankersley killed Kova while causing undue suffering. In *State v. Paulson*, 131 Wn. App. 579, 586, 128 P.3d 133 (2006), this court noted that

14

RCW 16.52.205(1) does not define "undue suffering." The *Paulson* court referred to

*Black's Law Dictionary*, which defined "undue" to mean "'excessive or unwarranted'"

and "suffer" [t]o mean "'to experience or sustain physical or emotional pain, distress, or

injury.'" *State v. Paulson*, 131 Wn. App. at 586.

Marvin Tankersley distinguishes *State v. Paulson*. In *Paulson*, the trial court

found defendants Steven Paulson and Troy Loney guilty of first degree animal cruelty for

shooting multiple arrows at a dog until it perished. In between shots, the defendants

pulled their arrows from the dying animal. Paulson and Loney did not dispute

intentionally killing the dog. Instead, they argued that they did not intentionally cause

undue suffering to the dog. On appeal, this court found the defendants' argument

unpersuasive, holding that sufficient evidenced proved the animal experienced undue

suffering:

> It is difficult to imagine that any dog . . . would not suffer unduly
> with such a killing scheme. The means show an intent to cause undue
> suffering because they would not have continued to shoot at it if it had died
> with the first shot. Furthermore, pulling the arrows out of a living dog to
> shoot it repeatedly aggravated the suffering. It was certainly within
> Loney's and Paulson's ability to understand that these repeated actions
> intentionally inflicted suffering in the course of killing the dog.

*State v. Paulson*, 131 Wn. App. 579, 588 (2006). Tankersley asserts that, unlike in

*Paulson*, the record is devoid of evidence of his intent to cause undue suffering or an

extreme indifference to life. He contends that the evidence is limited to his explanation at

trial that he stabbed Kova accidentally and only killed him to avoid unnecessary suffering. We disagree.

Marvin Tankersley's admission to stabbing Kova thrice before death echoes Steven Paulson's and Troy Loney's shooting a dog multiple times with arrows. Kova likely unduly suffered as a result of being stabbed once and then returning to being stabbed additional times. If Marvin Tankersley had killed Kova with the first stab, then Tankersley would not have continued stabbing the animal. The jury could have characterized this continuous stabbing as excessive or unwarranted.

Marvin Tankersley's assertion that his description of the events provided the only evidence presented at trial is incorrect. As explained above, the record contains ample evidence that contradicts Tankersley's version of what occurred. Based on this evidence, the jury discounted Tankersley's innocent explanation and concluded that he intended to cause Kova undue suffering.

Substantial evidence supports each of the alternative means by which the State alleged Marvin Tankersley committed animal cruelty in the first degree.

Malicious Mischief in Third Degree

Marvin Tankersley asserts that the State provided insufficient evidence to convict him of third degree malicious mischief. He contends that the State failed to disprove beyond a reasonable doubt that he possessed exclusive ownership over Kova.

16

RCW 9A.48.090 governs the crime of malicious mischief in the third degree. The statute states, in relevant part:

> (1) A person is guilty of malicious mischief in the third degree if he or she:
> (a) Knowingly and maliciously causes physical damage to the property of another, under circumstances not amounting to malicious mischief in the first or second degree.

RCW 9A.48.010(1)(c) defines "'property of another'" as:

> property in which the actor possesses anything less than exclusive ownership.

A person commits malicious mischief when damaging property in which another person has a possessory or proprietary interest. *State v. Newcomb*, 160 Wn. App. 184, 190, 246 P.3d 1286 (2011). One remains guilty even if he also enjoys an ownership interest in the property. *State v. Newcomb*, 160 Wn. App. at 190.

The undisputed facts showed that Marvin Tankersley tendered the purchase money for Kova. Nevertheless, according to Stevenson Veterinary Clinic employee Cynthia Gonser, Marvin and Roberta Tankersley wished for both Kova and Tigger the cat to be put under the same account. Gonser testified that the Tankersleys planned on having both animals "become both of theirs together, as they were coming together as a couple." RP at 208. Marvin and Roberta signed a joint client information sheet. Roberta and Marvin Tankersley jointly paid for Kova's veterinary bills.

17

Roberta Tankersley averred that Kova was a family dog and that other people in the household spent time with him. Faith Johnson testified that Kova belonged to "the house." RP at 94. Viewed in the light most favorably to the State, sufficient evidence supports the conclusion that Kova belonged, at least in part, to someone other than Marvin Tankersley.

Comment on Silence

Marvin Tankersley argues that the State commented on his post-*Miranda* right to remain silent while cross-examining him. Tankersley requests that this court remand for a new trial on this ground. The State responds that, because Tankersley's trial testimony contradicted his inculpatory post-*Miranda* statement, the State was entitled to cross-examine him on the contradiction.

The State may not, consistent with due process, use postarrest silence following *Miranda* warnings to impeach a defendant's testimony at trial. *State v. Belgarde*, 110 Wn.2d 504, 511, 755 P.2d 174 (1988); U.S. CONST. amends. V, XIV. Once a defendant waives the right to remain silent and makes a statement to police, the prosecution may use such a statement to impeach the defendant's inconsistent trial testimony. *State v. Belgarde*, 110 Wn.2d at 511.

After receiving *Miranda* warnings, electing to remain silent, and requesting an attorney, Marvin Tankersley voluntarily announced to Deputy Russ Hastings, "When this is over with and you don't find an animal, then I'm gonna walk, I'm gonna come get my

18

stuff and I'm gonna leave." RP at 168. At trial, State's attorney cross-examined Marvin

Tankersley:

> BY MR. [Patrick] ROBINSON [the State's attorney]:
> Q. It was an accident, so that's why you drove up to the middle of nowhere and left the dog so no one could find it, correct?
> A. No, sir.
> Q. It was an accident and you didn't do anything wrong, that's why you told the police about the prowler, correct?
> A. No, sir.
> Q. You didn't tell the police about the prowler, did you?
> A. No, sir.
> Q. In fact, everything you did when the police showed up was to try to hide your tracks, to try to get away with this, correct?
> A. No, sir.
> Q. And you even said to the police, if you don't find the dog, I'm gonna walk, correct, you said that?
> A. Yes, sir.

RP at 208. The cross-examination continued:

> Q. And again, you never told the police about the prowler, correct?
> A. No, sir, I lawyered up, cuz he gave me the Miranda rights and I said I'd take the lawyer and I quit speaking.
> Q. But then you said, if you don't find the dog, I'm gonna walk, right?
> A. Yes.
> Q. Okay and you never told the police about the silhouette near the blackberries, correct?
> A. Never did.
> Q. Never told the police about anything related to Tigger and the telephone pole, correct?
> A. Correct.
> Q. Never told them about tripping on the birdbath?
> A. Nope.
> Q. Never told them about accidentally stabbing Kova, correct?
> A. Nope.

RP at 212-13. Tankersley did not object to the State's line of questioning.

We reject Marvin Tankersley's assignment of error for two reasons. First, the State may question a defendant's failure to incorporate the events he relates at trial into a statement earlier given police or to challenge inconsistent assertions. *State v. Belgarde*, 110 Wn.2d 504, 511-12 (1988). A partial silence may, at the time of the initial statement, suggest a fabricated defense, and the silence properly impeaches the later defense. *State v. Belgarde*, 110 Wn.2d at 511-12. Tankersley's statement that law enforcement would not find a dead body conflicts with his innocent explanation, at trial, regarding Kova's death.

Second, Marvin Tankersley volunteered his remarks without questioning from a law enforcement officer. The law prohibits improper interrogation, not casual conversation. *State v. Cunningham*, 116 Wn. App. 219, 228, 65 P.3d 325 (2003). Once a defendant has asserted his right to counsel, the defendant can waive the right by initiating a conversation with law enforcement. *State v. Earls*, 116 Wn.2d 364, 382-383, 805 P.2d 211 (1991).

### CONCLUSION

We affirm Marvin Tankersley's convictions for animal cruelty in the first degree and malicious mischief in the third degree.

20

No. 37977-9-III
*State v. Tankersley*


A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Staab, J.