FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 MAR 11 AM 10: 24



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 67857-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JERRY LEWIS SMITH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 11, 2013 |
| | ) | |

VERELLEN, J. — Jerry Smith appeals from the judgment and sentence after a jury found him guilty of attempted commercial sexual exploitation of a minor. Because he fails to demonstrate that the prosecutor's closing argument deprived him of a fair trial, we affirm.

## FACTS

On June 13, 2010, the Seattle Police Department's gang and vice units were engaged in an operation to identify suspected prostitutes and pimps operating in a small area east of the Space Needle. As part of the operation, Seattle Police Officer Daljit Gill was working undercover. Her assignment was to tell any suspected pimp who

attempted to recruit her that she was 17 and working as a prostitute. A wire recorded her conversations with those who contacted her.[1]

That night, a car driven by Anthony Woods pulled alongside Officer Gill. Smith was the passenger. Officer Gill informed the men she was 17 and was working as a prostitute. She displayed a wrapped condom and then put it away, saying that she thought she would not need it at that moment.

Smith asked Officer Gill if she was really 17. She said she would be 18 in four months. Officer Gill told Woods and Smith that she recently moved to Seattle from Yakima to get away from her parents. Smith asked if she already had two dates that night, and how much she charged for intercourse.

Woods also directly asked if she had been working as a prostitute that night. Officer Gill said that she had been. Woods asked how much money she wanted to make. Officer Gill said about $500 for the night. Woods asked her how much money she had already earned. Officer Gill told him about $160. Before she walked away, Woods and Officer Gill exchanged cell phone numbers. Woods told her to call him if she needed help.

Smith called Officer Gill's cell phone twice that night, asking for "17." Officer Gill called Woods shortly thereafter. Woods wanted to know where she was, and said that he and Smith would "protect" her.

---

[1] Police previously obtained warrants to record the conversations with suspected pimps. Pretrial, Smith challenged the validity of the warrants. After a suppression hearing, the trial court concluded that the warrants satisfied the requirements of due process and of the Washington State Privacy Act, RCW 9.73.030. Smith has not challenged those rulings on appeal.

Woods, Smith and Officer Gill met again shortly thereafter, and spoke for about 20 minutes. Woods encouraged her to work for him as a prostitute. Woods promised Gill that he would handle her income, that they could use the Internet to get customers, and that he would protect her and help her understand the business. Smith participated in the conversation, alluding to Officer Gill's fictitious age and talking about money and travel:

> [Y]eah, I like a 17 and mean and all about green, you know what I'm talking about? . . . You know what I mean, for real. Yeah, I can see, I can see it in Vegas living outrageous and we can go to the Bay Area, okay, you know what I'm talking about?[2]

The conversation ended when a van pulled up with three men inside.

Woods engaged in a loud conversation with the men, who had begun to speak with Officer Gill. Officer Gill became uneasy during this confrontation and signaled her police colleagues for assistance. A uniformed police officer arrived and, to maintain Officer Gill's ruse, announced he was arresting her because she had a juvenile runaway warrant. Woods, meanwhile, drove off.

Smith remained behind. Smith told the uniformed officer that Officer Gill was his girlfriend. The officer checked Smith's identification card and then released him. The officer handcuffed Officer Gill and escorted her out of the area. Officer Gill had no more contact with Woods or Smith that night.

Eight days later, Officer Gill contacted Woods and Smith and attempted to draw them to her so they could be arrested. She told them she needed a ride after being released from the juvenile detention center. Officer Gill first called Woods, who said he

---

[2] Ex. 12 at 3 of 22.

3

would send someone to pick her up. Woods also gave Officer Gill Smith's telephone number. This touched off a series of phone conversations between Officer Gill, Woods, and Smith.

In a conversation Smith was not privy to, Woods instructed Officer Gill to give Smith all her money, and to work with Smith until Woods could arrange a flight for her to Las Vegas. Woods also told Gill what to charge customers for various sex acts.

When Officer Gill contacted Smith, he told her that he would pick her up at a convenience store near the detention center. He asked if there were any police nearby. Officer Gill walked to the meeting place, remaining in phone contact with Smith most of the way. She arrived at the meeting place first. When Smith arrived in his truck, he appeared nervous. Officer Gill walked up to the truck, confirmed Smith was the driver, and gave a signal to the arrest team. The officers took Smith into custody.[3]

The State subsequently charged Smith with one count of attempted promoting commercial sexual abuse of a minor in violation of RCW 9.68A.101.[4] Following a jury trial, he was convicted as charged. The trial court imposed 103.5 months of total incarceration.

Smith appeals.

---

[3] Continuing the ruse and attempting to ensnare Woods, Gill later called Woods and told him Smith never came for her. Woods told her he would send his niece for her. The police were not able to locate or arrest Woods.

[4] RCW 9.68A.101 provides, "A person is guilty of promoting commercial sexual abuse of a minor if he or she knowingly advances commercial sexual abuse or a sexually explicit act of a minor or profits from a minor engaged in sexual conduct or a sexually explicit act." Under RCW 9A.28.020, "A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime."

## DISCUSSION

Smith asserts that prosecutorial misconduct in closing argument deprived him of a fair trial. Because Smith did not object at trial to the majority of the argument, and because he declined the trial court's offer to give a curative instruction regarding the only argument Smith objected to at trial, Smith's argument is unpersuasive.

Prosecutorial misconduct in closing argument is grounds for reversal when the conduct was both improper and prejudicial in the context of the entire record and circumstances at trial.[5] A prosecutor is forbidden from appealing to the passions of the jury and encouraging it to render a verdict based on emotion rather than properly admitted evidence.[6] Prejudice is established if there is a substantial likelihood the misconduct affected the jury's verdict.[7] An objection to conduct of counsel in closing argument may be waived by the failure to request an admonition or a corrective or curative instruction.[8] Where no objection is made to improper arguments or remarks made by a prosecutor, reversal is required when the remarks are so flagrant and ill intentioned they could not have been cured by an instruction.[9]

---

[5] State v. Hughes, 118 Wn. App. 713, 727, 77 P.3d 681 (2003).

[6] State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988); State v. Echevarria, 71 Wn. App. 595, 598, 860 P.2d 420 (1993).

[7] State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995).

[8] State v. Charlton, 90 Wn.2d 657, 661, 585 P.2d 142 (1978) ("any objection to such conduct is waived by failure to make an adequate timely objection *and request a curative instruction*") (emphasis added). The reason for requiring a timely objection is so a party cannot "simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal." State v. Sullivan, 69 Wn. App. 167, 172, 847 P.2d 953 (1993). Juries are presumed to follow the trial court's instructions. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001).

[9] State v. Dennison, 115 Wn.2d 609, 623, 801 P.2d 193 (1990) (quoting Belgarde, 110 Wn.2d at 507).

Smith first challenges portions of the prosecutor's closing argument to which he did not object at trial. The prosecutor began closing argument by stating, "[H]ere in the City of Seattle, there is a real problem, and that problem has to do with the prostitution, forced prostitution of children."[10] The prosecutor then emphasized the dangers faced by child prostitutes:

> You have the girls who are out there having their bodies sold for sex, for money, who are getting into the cars of strangers, going to motel rooms, going to apartments, or their homes. And every time they do that, taking those risks that everyone is in agreement is out there: [t]he risks of getting into that car and being assaulted; having sex with a man who has sexually-transmitted diseases, and getting pregnant. Being raped. Being murdered.
>
> . . . .
>
> Keep in mind, Ladies and Gentlemen, as the Seattle Police Department set this operation up, if there is a 16 year old or a 15 year old or a 17 year old who's out there, they don't have any of that. They don't have the Gang Unit there watching over their backs. They don't have fellow officers who are going to come out of the alley to protect them or help them. They are all alone. [11]

In rebuttal argument, the prosecutor concluded:

> Ask yourself this. What if Officer Gill really was 17 and really was a juvenile involved in prostitution? What next for her? What next for her if it's not the police who's arresting Mr. Smith on June 21st[?] What's next? That's why this case matters. And that's why, when you look back at this evidence and you look at the role that the defendant played. I'm [not] saying he's the primary actor, but he's a key player.[12]

First, we conclude these remarks were not improper. The prosecutor's comments addressed specific testimony and were within the broad discretion allowed

---

[10] Report of Proceedings (RP) (June 7, 2011) at 148.

[11] Id. at 149-151.

[12] RP (June 8, 2011) at 71-72.

the State to argue reasonable inferences from the evidence and respond to defense arguments.[13]

Smith repeatedly testified that he was acting out of concern for Officer Gill's best interests, and was trying to protect her from the dangers she faced. He acknowledged that he believed Officer Gill was a prostitute, and that he was aware of the types of dangers a prostitute faced, including rape, assault, and death:

> Q. Do you agree that there are dangers for the . . . woman or the girl involved, who is involved in prostitution?
>
> A. Sure. That's why I told Mrs. Gill she needed to go home.
>
> . . . .
>
> A. In that line of work, you could get killed, you could get beat up, you could get raped, you could get whatever.[14]

Smith explained that he was thinking about the potential dangers a young prostitute would face while he was listening to Officer Gill's fictitious character's narrative:

> I'm listening, and I'm trying to put it together like, why wouldn't you want to be married as opposed to being in dangerous situations[?] . . . [S]he could get killed, raped, robbed, whatever.[15]

Smith also testified that his statements to Officer Gill that she needed "protection" were rooted in concern for her safety.[16] Smith also testified that when he asked Officer Gill if there were any police officers around when he was preparing to pick her up on June 21,

---

[13] State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997); State v. Hoffman, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991).

[14] RP (June 7, 2011) at 50-51.

[15] Id. at 75.

[16] Smith testified, "What I meant is, when I said, used the word 'protection,' I said, 'Well, if you're down here,' right? . . . I said, 'Well, you need to use some type of protection.' When I mean protection, I wasn't talking about from sexual contact. . . . I was talking about a gun or knife or something." RP (June 7, 2011) at 82.

it was because he was concerned for her safety.[17] Smith's counsel argued that Smith

was protecting Officer Gill in the face of danger:

> Members of the Jury . . . it just seems to me that the track [the area
> of prostitution] is an area all to itself that is, has a poisonous feel to it. It's
> not like other settings where, for example, if you said, 'Hey, you better go
> home, little girl, your—it's dangerous out here.' In another setting, in
> another part of the city . . . you wouldn't think anything of it. And as a
> matter of fact, Jerry would have been [a] hero in other settings in the city
> had he stepped in front of a young lady and had three guys, who seemed
> to be threatening her, and Jerry would have been a hero because he was
> watching out for her.
>
> Jerry respects women. As he said, 'We don't beat up on women.'
> He said that in the . . . transcript. And he tried to diffuse the violence. But
> in the track, that become[s] poisonous. That becomes a mark against
> you. That becomes a signal that, 'Oh, he's pimp because he's protecting
> her.' Anything outside of that boyfriend girlfriend, in the track, it's
> malevolent. Outside of that, that's a very nice thing to have in your
> pocket.[18]

Because the prosecutor's argument directly addressed Smith's own testimony

and was responsive to issues argued by the defense, Smith fails to show that these

remarks were improper.[19]

The only portion of the argument Smith objected to at trial was the prosecutor's

remark at the very end of his rebuttal argument: "That's why you should find him guilty,

and I hope you do."[20] After the jury began its deliberations, Smith objected, contending

---

[17] Smith testified, "I said, 'Are the police around?' . . . [B]ecause if the police is
around, you have nothing to worry about getting attacked or, or picked up by anyone,
because they're going to see the confrontation, or whatever is it, because like I told you,
the lady called me acting like she was frantic. . . . I'm the one who told her to go to the
[convenience store] where I knew there was cameras and everything would be
videoed." RP (Jun. 7, 2011) at 19-20.

[18] RP (Jun. 8, 2011) at 15-16.

[19] Stenson, 132 Wn.2d at 727; Hoffman, 116 Wn.2d at 94-95.

[20] RP (Jun. 8, 2011) at 71-72.

that the remark was an improper statement of the prosecutor's personal belief in Smith's guilt.[21] The trial court sustained the objection, asked Smith's counsel what relief she wanted, and offered to provide a curative instruction to the jury. Counsel declined the offer to give a curative instruction. Smith's counsel explained that she was simply "making a record," and that "relief is something the Court of Appeals can grant."[22]

Because Smith declined the trial court's offer to give a curative instruction, he waived his objection.[23] Smith fails to demonstrate that (1) a curative instruction would not have prevented any prejudicial effect and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict.[24] We conclude that a contemporaneous instruction would have alleviated any prejudicial effect of the prosecutor's arguments, had Smith requested one, and that any misconduct did not likely affect the jury's verdict.

There was an abundance of evidence in this case, including the multiple recordings of Smith's and Wood's conversations with Officer Gill, Smith's own testimony about his actions, which the jury was entitled to weigh for or against him, and the testimony of Officer Gill and the other the investigating officers. We conclude that Smith has not met his burden of demonstrating that the prosecutor's remarks had a substantial likelihood of affecting the jury verdict.

---

[21] See, e.g., State v. Traweek, 43 Wn. App. 99, 107, 715 P.2d 1148 (1986) (concluding it was error for a prosecutor to tell the jury he "knew" the defendant committed the crime).

[22] RP (Jun. 8, 2011) at 77.

[23] Charlton, 90 Wn.2d at 661.

[24] State v. Emery, 174 Wn.2d 741, 761, 278 P.3d 653 (2012).

Smith's arguments in his statement of additional grounds for review, that there was no probable cause supporting his arrest and insufficient evidence to support his conviction, are without merit. The record reveals that ample evidence supported both a finding of probable cause to arrest him and the jury's verdict as to each element of the charged offense.

Smith has not demonstrated any basis for relief in this appeal.[25]

Affirmed.

WE CONCUR:

---

[25] Smith's assignment of error concerning unfiled CrR 3.6 findings is now moot because the findings have been filed and the court can no longer provide any effective relief. State v. Turner, 98 Wn.2d 731, 733, 658 P.2d 658 (1983).