# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73411-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARIA GONZALES ESQUIVEL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 6, 2017 |

VERELLEN, C.J. — A jury found Maria Gonzales Esquivel guilty of rape and

multiple counts of assault. The jury also entered special verdicts that each of the

offenses involved statutory aggravating factors. On appeal, we reject Esquivel's claims

that the deputy prosecutor committed misconduct during closing argument and that the

statutory aggravating factors are unconstitutionally vague. We agree that the trial court

failed to articulate a sufficient basis for one of the no-contact orders and erred in

entering a life sentence for Esquivel's first degree assault conviction. We therefore

affirm Esquivel's conviction and remand only to permit the trial court to address the

basis for the duration of the no-contact order and to correct the erroneous sentence.

## FACTS

Based on allegations that she physically and mentally abused members of the

Chagoya family while they lived in her home, the State charged Esquivel with one count

of rape and multiple counts of assault. At trial, the State presented evidence that

Esquivel became acquainted with the Chagoyas in about 1996 and lived with the family

No. 73411-3-I/2

for a few months. Rafael and Veronica Chagoya had several children, born between 1991 and 2003. They divorced in 2006 but continued to live together.

Esquivel claimed that she knew how to read tarot cards and that she was a "healer."[1] Rafael was impressed that Esquivel also appeared to be a practitioner of Santeria[2] and knowledgeable about the "supernatural."[3] For a fee, Esquivel offered to "heal"[4] the Chagoya children of any illness or problems they encountered. Veronica testified that she eventually paid Esquivel $40,000 in cash for an unsuccessful attempt to "cure"[5] her son's autism. Esquivel carried out the attempted cure by contact with "spiritual entities."[6] By 2006, Esquivel was claiming that the Chagoyas owed her "tens of thousands" for her healing services.[7] Believing that Esquivel possessed supernatural powers, Rafael remained "very respectful and mindful."[8]

For various reasons, including financial difficulties resulting from the debt for healing services, all of the Chagoya family members had moved into Esquivel's home

---

[1] Report of Proceedings (RP) (Feb. 4, 2015) at 4015.

[2] Santeria, "the way of the saints," is a fusion of the traditional religion of the African Yoruba people and Roman Catholicism. See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 524, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993).

[3] RP (Feb. 4, 2015) at 4025.

[4] Id. at 4028.

[5] Id. at 4026.

[6] Id. at 4027.

[7] Id. at 4029.

[8] Id. at 4031.

by the end of 2009. Esquivel later kicked Veronica out and began a lengthy campaign of mental and physical abuse.

Esquivel's treatment of the Chagoyas' daughter V.C., who turned 18 in 2009, was particularly cruel. Esquivel sought to prevent V.C. from attending school or completing her homework by forcing her to perform chores around the house. To curb V.C.'s alleged inclination to become "some crack addicted person," Esquivel forced her "to drink this insane amount of beer every morning before eating anything."[9] When V.C. became sick or drunk as a result, Esquivel made her stay home from school.

Esquivel exerted control over V.C. in other ways. In conjunction with her father's alleged debt, Esquivel would prevent V.C. from sleeping for days at a time, order her to perform chores during the night, and force her to ingest various foods and beer. Esquivel did not allow V.C. to leave the house by herself or maintain any friendships.

Esquivel also commenced routine beatings of the Chagoya family members. The beatings were directed primarily at V.C. and Rafael, but involved all family members. Esquivel would beat both V.C. and Rafael daily on the head, arms, and legs, using whatever was handy at the moment, including a rolling pin, can-opener, electrical wires, cables, kitchen utensils, and a rubber mallet. V.C. constantly had black eyes, bruises, open sores, and swelling. Frequently, when Esquivel tired of administering the beatings, she forced the Chagoya family members to abuse one another.

---

[9] RP (Jan. 29, 2015) at 3624.

3

On one occasion, Esquivel struck V.C. hard enough to split her lip completely, requiring several layers of stitches. The beating also perforated V.C.'s eardrum. At trial, V.C. testified she had scars "on my buttocks, on my legs, on my arms, on my lip, on my clavicle, nearby my neck, my shoulder, and on my face."[10]

In March 2011, Esquivel informed V.C. that she was going to cure her of an alleged case of herpes. As part of this "treatment," Esquivel repeatedly raped V.C. with a scrub sponge soaked in cane alcohol. Esquivel claimed that she was going to charge V.C. for the treatment.

In April 2011, Esquivel indicated that she was planning to move the family to Texas. Thinking she might die if Esquivel moved the family, V.C. escaped and fled to a nearby church, where she found long-term shelter with one of the parishioners. V.C. did not reveal Esquivel's abuse to authorities for several months, until she saw her father and brother on the street and feared that her departure had made things worse for them.

Esquivel frequently used a wooden rolling pin to beat Rafael on the hands and shins. The beatings injured Rafael's shins so severely that he needed emergency surgery, skin grafts, and extended hospitalization to save his legs.

In October 2010, Rafael required emergency surgery after Esquivel punched him in the face, breaking his nose, and then struck him several times with a rubber mallet, causing rib fractures, a punctured lung, and a lacerated spleen.

---

[10] RP (Feb. 2, 2015) at 3741.

4

On one of the days that Esquivel administered her "cure" for herpes to V.C., Esquivel stabbed Rafael above the eyebrow with a broken hairbrush. She then hit him in the eye with a medicine bottle, rupturing the eye globe. Despite multiple surgeries, Rafael has remained permanently blind in that eye.

One evening, believing that he could no longer endure the torture, Rafael hobbled out of the house and attempted to escape. Esquivel, driving a pickup truck and accompanied by two of Rafael's children, caught up to him a few blocks away.

After returning Rafael to the house, Esquivel administered a particularly ferocious beating. In the presence of two of his children, Esquivel forced Rafael to remove his pants. She then used a wooden stick to beat his testicles and penis. Rafael required treatment for rib fractures, leg injuries, and a "macerated penis."[11]

Although he was repeatedly hospitalized, Rafael acknowledged that he lied when asked about the source of his injuries. He explained that he feared Esquivel's apparent supernatural powers and what she might do to his children. Rafael also believed he lacked the financial means to find a different home for his family.

E.G., Esquivel's 11-year-old daughter, testified that when she was in her bedroom, she frequently heard the Chagoya family members screaming and the sounds of "whips of wires or the hits of punching."[12] E.G. said it sounded as though the

---

[11] RP (Feb. 5, 2015) at 4160.
[12] RP (Dec. 18, 2014) at 2250.

5

Chagoyas "were being harmed very intentionally."[13] E.G. also observed Esquivel hit some of the Chagoya family members. While listening to the beatings, E.G. feared that she might end up like the Chagoyas.

Esquivel flatly denied that any of the alleged abuse had occurred in her house.

The State charged Esquivel with one count of assault in the first degree–domestic violence and one count of assault in the second degree–domestic violence involving Rafael and two counts of assault in the second degree–domestic violence and one count of rape in the second degree involving V.C. The State also alleged that each offense involved more than one of the following aggravating factors: an ongoing pattern of psychological, physical, or sexual abuse of the same victim or multiple victims, deliberate cruelty, destructive and foreseeable impact on persons other than the victim, the offenses occurred within sight or sound of a minor child of the victim or offender, and the defendant's use of a position of trust to facilitate the offense.

The jury found Esquivel guilty as charged and found each of the aggravating factors. The court rejected both parties' sentencing recommendations and imposed exceptional statutory maximum sentences on all counts, all to be served consecutively: 120-month terms for the three second degree assault counts, minimum and maximum terms of life for the rape count, and a term of life for the first degree assault count. The court also ordered lifetime no-contact orders for all of the Chagoya family members and a 20-year no-contact order for Esquivel's daughter E.G.

---

[13] Id. at 2249.

6

No. 73411-3-I/7

## ANALYSIS

### *Prosecutorial Misconduct*

Esquivel contends that the deputy prosecutor committed reversible misconduct during rebuttal closing argument by suggesting that in order to acquit her, the jury would have to find that the State's witnesses were lying. A defendant alleging prosecutorial misconduct bears the burden of establishing that the challenged conduct was both improper and prejudicial.[14] Prejudice occurs only if there is "a substantial likelihood the instances of misconduct affected the jury's verdict."[15] We necessarily review misconduct claims in the context of the total argument, the evidence addressed, the issues in the case, and the jury instructions.[16]

During closing argument, defense counsel argued that the jury should consider several factors when assessing the credibility of the State's witnesses, including V.C.'s delay in reporting the abuse after her escape and the inconsistent and untruthful statements that Rafael gave to various investigators. Defense counsel also suggested that the Chagoya children's settlement of two lawsuits, including an $8 million settlement with Child Protective Services (CPS), affected their credibility:

---

[14] State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).

[15] State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995).

[16] State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

7

The other point is the lawsuit. I don't want to—nobody's going to make up a complete story because of a lawsuit, but what a lawsuit does is cause people sometimes to exaggerate testimony or they will minimize the testimony. And it can cause embellishment or creation of helpful facts.[17]

The deputy prosecutor responded to this argument during rebuttal:

Now, the defense also wanted to talk to you about somehow *the Chagoyas must have—after all was said and done, must have come together and concocted this grandiose story to tell you.* That in those couple times between [V.C.] leaving and their testimony that they were able to come together and make this plan to implicate the defendant as the person who had done all of these injuries against them.

*But in order for that to be true, you'd have to believe that they had some motive to pick the one person that cared for them, that took them in, that put a roof over their head and supposedly cared for them, gave them food, gave them clothes, and offered them a place to stay when they had nowhere to go.* And that story would have to have stuck with them over the course of the years that has gone by since the defendant's arrest in August of 2011. It would have to involve a myriad of people.

First, it would have to include an 11-year-old girl, E.G., the defendant's own daughter. It would have to include her father, Juan Pineda. And he would have to get up here and she would have to get up here and tell you things that were not true. They would also have to get other people to agree to this masterful story that the people who had come in contact with Ms. Esquivel and how she related to people to agree to *this masterful story* that the people who had come in contact with Ms. Esquivel and how she related to people like [V.C.] and get them to agree to characterize their relationship as somehow unfavorable.

. . . .

*You would have to believe, then, that the Chagoyas would have to get somebody like Adair Ellison or Albert Lewis to testify falsely* about the times the defendant wouldn't leave when they asked to speak to [V.C.] alone. *You'd have to believe* that they had asked people like Adair Ellison to talk about that time when the defendant spoke in Spanish with [V.C.] during that interview, and the times that she would talk about the abuse

---

[17] RP (Feb. 18, 2015) at 4782.

that was happening. You'd have to get—*they'd have to get somebody like Detective Priebe-Olson to agree to testify falsely about all the defendant's statements that she made during the course of her time with her and all the contacts that she had made with her that was contradicted by the evidence that you have.* This plan would have been completely impossible to execute over the course of this long trial involving that many people.

This notion of—that this family must have come together to talk about and create this story is unreasonable and implausible. There's nothing about them that you've learned that would give you the impression that they were able to make this plan come together and come to life. They're not that sophisticated.[18]

The prosecutor may not argue that in order to *acquit* a defendant, the jury must find that the State's witnesses are either lying or mistaken.[19] "Such arguments may undermine the presumption of innocence, shift the burden of proof, and mislead the jury because '[t]he testimony of a witness can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved.'"[20]

Here, however, Esquivel failed to object to the alleged misconduct. When the defendant fails to object, we will not review the alleged error unless the defendant demonstrates the misconduct was "so flagrant and ill intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct."[21]

---

[18] RP (Feb. 18, 2015) at 4799-4802 (emphasis added).

[19] State v. Fleming, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996); see also State v. Wright, 76 Wn. App. 811, 826, 888 P.2d 1214 (1995) (misconduct to argue that the jury must find the State's witnesses are lying in order to believe the defendant).

[20] State v. Rafay, 168 Wn. App. 734, 836, 285 P.3d 83 (2012) (quoting State v. Casteneda-Perez, 61 Wn. App. 354, 362-63, 810 P.2d 74 (1991)).

[21] State v. Belgarde, 110 Wn.2d 504, 507, 755 P.2d 174 (1988).

Esquivel has not suggested why a prompt objection and curative instruction could not have prevented any potential prejudice from the alleged misconduct. During rebuttal closing argument in State v. Barrow,[22] the deputy prosecutor improperly argued that the jury would have to believe that the police officers were lying in order to find the defendant not guilty. We held that a curative instruction "could have obviated any prejudice engendered by these remarks."[23]

Moreover, the challenged comments were not improper. Viewed in context, the deputy prosecutor did not invite the jury to make an improper choice between acquitting Esquivel or determining that the State's witnesses were lying. Rather, the deputy prosecutor appropriately responded that the defense theory was "unreasonable and implausible" because of the broad scope of the alleged conspiracy, the number of necessary participants, and the chronological constraints.[24] Under the circumstances, the comments were not improper and fell within the wide latitude accorded the prosecutor to draw reasonable inferences from the evidence during closing argument.[25]

### No-Contact Order

Esquivel contends that the 20-year no-contact order prohibiting all contact with her daughter E.G. violated her constitutional right to parent. We agree that the trial

---

[22] 60 Wn. App. 869, 809 P.2d 209 (1991).

[23] Id. at 876.

[24] RP (Feb. 18, 2015) at 4801.

[25] See State v. Gentry, 125 Wn.2d 570, 641, 888 P.2d 1105 (1995).

No. 73411-3-I/11

court failed to articulate a basis for the duration of the order and remand for further proceedings.

Under the Sentencing Reform Act, the trial court may impose "crime-related prohibitions" as a condition of sentence.[26] A "crime-related prohibition" prohibits "conduct that directly relates to the circumstances of the crime for which the offender has been convicted."[27] An appellate court generally reviews crime-related prohibitions for an abuse of discretion.[28] Although the overall standard of review remains the same, we review "more carefully"[29] sentencing conditions that interfere with a defendant's constitutional rights:

> A defendant's fundamental rights limit the sentencing court's ability to impose sentencing conditions: "[c]onditions that interfere with fundamental rights' must be 'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential needs of the State and public order."[30]

Parents have a fundamental constitutional right to the care, custody, and companionship of their children.[31] But a parent's rights are not absolute, and the State

---

[26] RCW 9.94A.505(9).

[27] RCW 9.94A.030(10).

[28] State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008).

[29] In re Pers. Restraint of Rainey, 168 Wn.2d 367, 374-75, 229 P.3d 686 (2010).

[30] Id. at 377 (quoting Warren, 165 Wn.2d at 32).

[31] Id.

11

has a compelling interest in protecting children from conduct that threatens to cause emotional or physical harm.[32]

In In re Personal Restraint of Rainey,[33] the defendant was convicted of kidnapping his daughter as part of an ongoing domestic dispute with his ex-wife. The defendant also had a history of utilizing the child in efforts to inflict emotional distress on the mother.

Our Supreme Court concluded that under the circumstances, a total no-contact ban "of some duration" was appropriate.[34] But the court nonetheless struck the no-contact order because the trial court did not articulate a reason for the lifetime duration, and the State failed to demonstrate that a lifetime order was reasonably necessary to protect either the child or the mother. The court remanded for resentencing to permit the court to "address the parameters of the no-contact order" under the "reasonably necessary" standard.[35]

The State contends that the 20-year no-contact was reasonably necessary to prevent further harm to E.G., pointing to evidence that she was repeatedly forced to listen to, or witness, Esquivel's extreme physical abuse of the Chagoya family members and feared she might be subject to similar abuse. The State maintains that E.G. was therefore a "victim" of Esquivel's conduct because she "sustained emotional,

---

[32] Id. at 378.

[33] 168 Wn.2d 367, 229 P.3d 686 (2010).

[34] Id. at 380.

[35] Id. at 382.

12

No. 73411-3-I/13

psychological, physical, or financial injury to persons or property as a direct result of the crime charged."[36]

The evidence in this case clearly supported the imposition of a no-contact order as to E.G. But the mere fact that E.G. was a victim of Esquivel's offenses does not justify a no-contact order of any length:

> The duration and scope of a no-contact order are interrelated: a no-contact order imposed for a month or a year is far less draconian than one imposed for several years or life. Also, what is reasonably necessary to protect the State's interests may change over time. Therefore, the command that restrictions on fundamental rights be sensitively imposed is not satisfied merely because, at some point and for some duration, the restriction is reasonably necessary to serve the State's interests. The restriction's length must also be reasonably necessary.[37]

As in Rainey, the trial court here provided no reason for the duration of the no-contact order. Nor did the State explain why a 20-year no-contact order was reasonably necessary to protect E.G., who was 11 at the time of trial. Accordingly, we strike the no-contact order and remand for further proceedings to permit the trial court to address the no-contact order in light of the "reasonably necessary" standard.

*Life Sentence*

We accept the State's concession that the trial court erred in imposing an exceptional sentence of life for Esquivel's first degree assault conviction. Under the Sentencing Reform Act, the court must generally impose a determinate sentence that "states with exactitude the number of actual years, months, or days of total confinement,

---

[36] RCW 9.94A.030(54) (defining "victim").

[37] Rainey, 168 Wn.2d at 381.

13

of partial confinement, of community custody, the number of actual hours or days of community restitution work, or dollars or terms of a legal financial obligation."[38]

The State maintains that any error is harmless because of Esquivel's unchallenged minimum and maximum sentence of life for the rape conviction. In the alternative, the State suggests remand for entry of a determinate sentence at the high end of the standard range.

Because we are remanding for further proceedings on the no-contact order, we leave to the trial court on remand the determination of the appropriate procedure for correcting the sentencing error.

*Void for Vagueness*

Esquivel contends that the aggravating sentencing factors in RCW 9.94A.535(3)(a) and (h)(iii) are unconstitutionally vague under the due process clause and as applied to her conduct. She concedes, however, that our Supreme Court in State v. Baldwin expressly held that "the due process considerations that underlie the void-for-vagueness doctrine have no application in the context of sentencing guidelines."[39] The court also determined that the sentencing guideline statutes do not create "a constitutionally protectable liberty interest."[40]

---

[38] RCW 9.94A.030(18).

[39] 150 Wn.2d 448, 459, 78 P.3d 1005 (2003)

[40] Id. at 461.

14

Esquivel maintains that Baldwin is no longer controlling after the United States Supreme Court decisions in Apprendi v. New Jersey[41] and Blakely v. Washington.[42] But both Apprendi and Blakely rest firmly on the Sixth Amendment right to a jury trial. Esquivel provides no coherent legal argument suggesting how Apprendi and Blakely have undermined the due process vagueness analysis in Baldwin. We must therefore follow Baldwin.[43]

*Appellate Costs*

Relying on State v. Sinclair,[44] Esquivel asks this court to exercise its discretion and not impose appellate costs if the State substantially prevails on appeal. The State contends that the record is insufficient to determine Esquivel's present or future ability to pay appellate costs and that the burden should be on the appellant to provide sufficient information to this court to determine the issue.

The trial court entered an order of indigency, finding Esquivel unable to pay any of the expenses of appellate review. Nothing in the record suggests that Esquivel's financial condition has improved or is likely to improve.[45] Under the circumstances, including Esquivel's age and the length of her sentence, her continuing indigence, and

---

[41] 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

[42] 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[43] See State v. Gore, 101 Wn.2d 481, 486-87, 681 P.2d 227 (1984).

[44] 192 Wn. App. 380, 385-86, 367 P.3d 612, review denied, 185 Wn.2d 1034 (2016) (appellate court has discretion to deny appellate costs).

[45] See id. at 393 (appellate court gives a party "'the benefits of an order of indigency throughout the review unless the trial court finds the party's financial condition has improved to the extent that the party is no longer indigent'") (quoting RAP 15.2(f)).

15

No. 73411-3-I/16

the trial court's waiver of all nondiscretionary legal financial obligations, we exercise our discretion and conclude that an award of appellate costs is not appropriate.

We affirm Esquivel's convictions. We remand only to permit the trial court to address the basis for the no-contact order involving E.G. and to correct the sentence for the first degree assault conviction. No appellate costs will be awarded.

WE CONCUR: