IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CHRISTOPHER RODRIGUEZ, | No. 81417-6-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| HARLEY MARINE SERVICES, INC., OLYMPIC TUG & BARGE, INC., | |
| Respondents, | |
| and | |
| COLUMBIA PACIFIC BIO-REFINERY, | |
| Defendant. | |

COBURN, J. — Christopher Rodriguez sued Harley Marine Services, Inc., and Olympic Tug & Barge, Inc. (collectively, Harley Marine) after he fell from a gangway between a Harley Marine vessel and a dock. A jury found Harley Marine negligent and awarded Rodriguez $266,000 in damages. On appeal, Rodriguez contends a new trial on damages is required due to defense counsel's misconduct and because the trial court erred by not allowing Rodriguez's surgeon to testify about Rodriguez's future work restrictions.

We hold that Rodriguez failed to preserve error with regard to defense counsel's alleged misconduct and fails to establish that he was prejudiced by the exclusion of his surgeon's testimony. Accordingly, we affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

BACKGROUND

In February 2018, Rodriguez began working as a petroleum gauger for Inspectorate America Corporation. A petroleum gauger inspects petroleum by taking samples to test the quality of petroleum offloaded at a terminal.

On August 15, 2018, Rodriguez was called to gauge Harley Marine's barge, the "Dr. Robert Beall," while it was tied alongside a dock on the Columbia River. Rodriguez boarded the barge by walking across a gangway between the barge and the dock. As Rodriguez walked back across the gangway after he finished gauging, the gangway fell and Rodriguez fell with it landing on a "camel log"[1] between the barge and the dock. A witness who was in the barge office at the time later testified that he heard "kind of a bang sound" and knew "[s]omething was wrong." He walked toward where the gangway had been and saw that it was no longer there. When he got to the edge of the barge, he could see Rodriguez on the camel log, and he climbed a ladder down to assist Rodriguez. He later testified that Rodriguez commented he was "more embarrassed than anything" before climbing a ladder back up to the barge.

Rodriguez later testified that after his fall, he went to the barge office to fill out his report. At the request of barge personnel, Rodriguez also wrote a summary of his fall in which he indicated he "got scraped on [his] shin and will be seeking medical attention for [his] ankle that [he] fell on." After completing his paperwork, Rodriguez drove to an urgent care facility near his home in

---

[1] A camel log is a log that floats alongside a dock and prevents vessels from hitting the dock and damaging it.

Vancouver, Washington.  There, he was fitted with a walking boot and crutches.

After his initial visit with urgent care, Rodriguez saw David Allen, a physician assistant in Vancouver, on August 29, 2018.  According to Allen's later testimony, Rodriguez's ankle was swollen and bruised.  Allen testified that his chart notes from that examination contained no mention of a headache or concussion-like symptoms, and he noted that there was no injury to Rodriguez's head or neurological symptoms.  Allen diagnosed Rodriguez with an ankle sprain and lumbar strain, and referred him to physical therapy.

Allen continued to treat Rodriguez for a number of months.  Meanwhile, in October 2018, Rodriguez sued Harley Marine for negligence.  Rodriguez claimed that Harley Marine's negligence caused damages including, among other things, loss of future earning capacity.

By October 10, 2018, according to Allen's chart notes, Rodriguez was showing " '80 percent improvement of the back and 65 percent improvement of the left ankle.' "  According to an October 31, 2018 chart note, Rodriguez was continuing to improve, though his low back had only minimally improved since his last visit with Allen.

Allen saw Rodriguez again on November 20, 2018.  Allen's chart note from that visit indicated a " 'curious presentation overall.' "  Allen later testified the reason for this characterization was that "during [Rodriguez's] initial injury, the ankle was very severe in nature and the back was minimal.  Then the back pain symptoms gradually increased over time."  Allen referred Rodriguez to a physiatrist and recommended magnetic resonance imaging (MRI) in the future.

3

Allen examined Rodriguez again on December 18, 2018. In the interim, Allen had received a physical therapy report indicating that Rodriguez was able to walk for over one hour pain-free, squat and lift 50 pounds without pain, and lift and carry 50 pounds. Allen later testified that at the December 2018 visit, he and Rodriguez, who had been working in light duty jobs since August, talked about Rodriguez going back to work as a gauger. Allen also testified that Rodriguez told him he felt ready to return to work without restrictions. According to Allen's chart note, Rodriguez was still exhibiting some lumbar back pain, but Allen's objective exam revealed a normal range of motion, no tenderness, no swelling, no edema, no deformity, and no spasms. Allen noted Rodriguez was improving well with continued physical therapy. Allen later testified that with Rodriguez's recent improvements, Allen believed an MRI was no longer necessary. Allen released Rodriguez back to work, without restrictions, on a two-week trial basis, advising Rodriguez to be careful and to stop immediately if there was any return or flare-up of his low back pain.

Allen saw Rodriguez another time on January 3, 2019. Allen later testified that Rodriguez had no complaints at that time. Allen's chart note indicated that Rodriguez had soreness on his first day back at work but that he improved significantly as he continued work. Allen's note also indicated that during the two-week trial work period, Rodriguez had worked an average of 82 hours per week, and Rodriguez denied low back pain, redness, swelling, bruising, numbing, tingling, or loss of function. At that point, Allen discharged Rodriguez from his care and cleared Rodriguez for work without restrictions. According to Allen's

later testimony, Rodriguez did not complain to Allen about any neck or thoracic pain, knee injury, headaches, or head injury.

On January 28, 2019, Rodriguez saw Dr. Victoria Do, a general practitioner in Houston, Texas. Rodriguez was referred to Do by his attorney. According to Do's chart note from the visit, Rodriguez indicated he lost consciousness at the time of his August 2018 fall, and he complained of persistent headaches that had been present since the fall, pain along his whole spine, and bilateral knee pain. Do ordered a brain MRI and MRIs of Rodriguez's cervical spine, thoracic spine, lumbar spine, and knees. According to a February 6, 2019 chart note, the MRIs revealed injuries in Rodriguez's knees and left ankle, and herniated thoracic and lumbar discs. Do referred Rodriguez to Dr. Ruben Bashir, a spine surgeon also based in Houston. Do also recommended a neuropsychological evaluation.

On March 22, 2019, Rodriguez served his responses to Harley Marine's first discovery requests. One of those discovery requests asked Rodriguez to identify "each expert witness who may be used by you at trial to present evidence under ER 702, 703, or 705." It also directed Rodriguez to "for each expert disclose the following information as required by CR 26(b)(5)(A)(i): . . . the subject matter on which the expert is expected to testify, . . . the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion." Rodriguez responded, "Plaintiff will produce responsive information in accordance with the Court's scheduling order and the Washington Rules of Civil Procedure." Although the parties disagree as to

5

whether supplementation was required, it is undisputed that Rodriguez did not, at any time before trial, supplement his discovery responses with the substance of any opinion to which Bashir was expected to testify.

On May 1, 2019, Rodriguez was evaluated by Dr. Larry Pollock, a Houston-based neuropsychologist.

On May 23, 2019, Rodriguez served a preliminary witness disclosure in which he identified a number of "non-retained medical witnesses" that "have provided care and treatment to Plaintiff." According to Rodriguez's witness disclosure, these witnesses "may provide testimony regarding Plaintiff's injuries, course of treatment, care, diagnosis, prognosis, causation, surgeries, medical costs, reasonableness and necessity of his past and future medical care, physical limitations, work/physical restrictions, causation, future prognosis, and the need for future medical care." Allen and Do were listed among these witnesses; Bashir and Pollock were not. The only medical "expert witness" listed in Rodriguez's preliminary witness disclosure was Todd Cowen, M.D., who was expected to testify about Rodriguez's "care, treatment, diagnosis, prognosis, causation, physical restrictions, reasonable costs for medical care in the past and future, and the need, if any, for future treatment."

On July 15, 2019, Rodriguez served a supplemental witness disclosure in which he added Pollock to the list of "non-retained medical witnesses."

On September 3, 2019, which was the trial court's deadline for disclosure of possible primary witnesses, Rodriguez served another "preliminary" witness disclosure. The September witness disclosure was similar to the earlier

disclosures except that instead of listing Rodriguez's treatment providers as "non-retained medical witnesses" who would testify about, among other things, causation, future medical care, physical limitations, and work/physical restrictions, it listed them under a section titled "Treatment Providers" and did not specify the nature of their expected testimony. Bashir and Pollock were both listed among Rodriguez's treatment providers as witnesses who had "personal knowledge of Christopher Rodriguez's physical state after the time of the accident." Cowen remained the only medical "expert witness" listed in the disclosure.

The deadline for disclosure of possible additional witnesses was October 14, 2019. On November 6, 2019, Bashir performed back surgery on Rodriguez.

On December 16, 2019, which was the trial court's discovery cutoff date, Rodriguez served a second supplemental witness disclosure. Unlike the September disclosure, but like the earlier May and July disclosures, the second supplemental witness disclosure listed Rodriguez's treatment providers as "non-retained medical witnesses" who would testify "regarding Plaintiff's injuries, course of treatment, care, diagnosis, prognosis, causation, surgeries, medical costs, reasonableness and necessity of his past and future medical care, physical limitations, work/physical restrictions, causation, future prognosis, and the need for future medical care." Do, Bashir, and Pollock were listed among Rodriguez's non-retained medical witnesses; Cowen remained the only person listed as a medical "expert witness."

Shortly before trial began, Rodriguez moved in limine "to prohibit the defendants from offering any evidence, making any references to, or presenting any arguments before the jury, that relate to Mr. Rodriguez's lawyers referring him to his treating physicians." He argued that the evidence was inadmissible as irrelevant and/or unduly prejudicial under ER 402 and ER 403. Harley Marine countered that the evidence was relevant to challenge the physicians' credibility by showing bias and financial interest in the outcome of Rodriguez's lawsuit.

When the issue arose during argument on the parties' motions in limine, the trial court indicated that the evidence could be relevant to the physicians' bias, but requested more specifics:

> I'll want to hear what exactly the evidence is. And I'll just – just so everyone knows, ultimately the issue for this court is, is it relevant to cross-examination on bias . . . . So that's my focus so you understand that. . . . So my question for everyone is, what is – who's the witness? Like, what's the name of the witness? You know, we're dealing with the abstract here. But who's the witness, and what is the evidence regard[ing] bias regarding that particular witness? Because I think if we stay focused on individual witnesses and what the particular evidence is, that's ultimately what I have to rule on, okay.

Later, Harley Marine's counsel acknowledged that the only evidence of an attorney-doctor referral was an entry in Pollock's notes indicating that Rodriguez had been referred to Do by his attorney. Counsel argued, however, that with regard to Pollock, there was "a fair amount of information that Dr. Pollock . . . happens to work with [Rodriguez's attorneys] a fair amount." The trial court ultimately ruled, "You can ask the question if you have some evidence that – and all I've heard so far is Dr. Do really. The fact that some other doctors have worked with [Rodriguez's attorneys] – but if there's no direct evidence in this

8

case, I'm going to cut it off there."

The jury was sworn on February 4, 2020. It is undisputed that at the time of trial, Rodriguez was still recovering from his November 2019 back surgery with Bashir. It also is undisputed that Bashir planned to reevaluate Rodriguez in March, i.e., after trial.

During Rodriguez's opening statement, counsel stated, "Now, after [Rodriguez's] back surgery, he's unable to return to work and you'll hear from his doctors *who will tell you that he can't return to his work as a petroleum inspector due to the nature of the job.*" (Emphasis added.) Defense counsel requested a sidebar, which the court later memorialized as follows: "Defense . . . indicated an objection to . . . the opening statement that refer[red] to an anticipated doc[tor]'s testimony that the Plaintiff could not go back to work or work in the future. The Defense indicated that was new information." The trial court stated, "It sounds like it might be a discovery issue," and it would entertain a motion about the testimony.

Two days later, Harley Marine filed a motion to "exclude undisclosed expert opinion testimony from plaintiff's treating Texas healthcare providers, including Dr. Bashir, Dr. Do, and Dr. Pollock." Harley Marine argued that during his opening statement, Rodriguez's counsel "made it clear [Rodriguez] intends to offer expert opinions from his Texas treating providers concerning causation and work/physical restrictions." Harley Marine contended that such testimony should be excluded because Rodriguez did not identify any of his treating providers as experts with regard to those issues.

The court heard the motion on February 10, 2020. By then, Harley Marine had narrowed the scope of its motion to testimony only from Bashir as it related to Rodriguez's ability to return to work. When the trial court asked Rodriguez's counsel "what the actual testimony is," counsel responded,

> So as far as Dr. Bashir is concerned, I believe the testimony would be, according to the records, he was restricted from work following his surgery. They had a December date where they were going to look at him again. They've got records to that effect. Defendants do. On that date they said they would – he can't return to work. They're going to reevaluate him in March, well beyond the date of this trial. So at no point has anyone said he can return to work.
> I think what the doctor is going to talk about is this type of surgery, the limitations associated with this surgery, and how it may impact different types of professions that he's involved in. But, I mean, it's a limitation aspect of having a back surgery.
> I do not anticipate that he's going to give testimony that he can never do any type of, you know, any type of work forever for the rest of his life. But there are limitations regarding what type of work you can and can't do with a surgery of this type.
> And that's what I anticipate, Your Honor, based on his education, knowledge, and experience related to these types of surgeries, the invasive procedure on his back, and what impact that could have regarding his specific job that he was employed in prior to this incident.

The trial court followed up, asking "Well, so . . . what does it mean, limitations as to what kind of work? I mean, what's the concrete testimony? Like he can't lift things? I mean, what's – it's going to be more concrete than that, I would assume." Rodriguez's counsel then responded, "Sure. And I mean, I honestly haven't asked him the question to know exactly, but he's here. . . . I can ask him now, if the Court would like."

The trial court called a brief recess to allow Rodriguez's counsel to confer with Bashir, remarking that "when one asks to exclude testimony . . . I like to know what I'm excluding." When Rodriguez's counsel returned, he made the

following offer of proof:

> So, Your Honor, I spoke to him and he said for this type of surgery generally the recovery period would be, you know, depending on the person, five to six months, which is why he's coming back in March.
>
> He said – I said what about as far as restrictions are concerned? He said he would advise him to not return to this type of work, which requires repetitive lifting, climbing stairs, ladders, things of that sort in the future.

After additional argument from the parties, the trial court conducted an on-the-record Burnet[2] analysis and granted Harley Marine's motion to exclude any testimony from Bashir about Rodriguez's future work restrictions.

Later, Rodriguez's counsel conducted a voir dire examination of Bashir as an additional offer of proof:

> Q      So, Dr. Bashir, real quick, as we sit here today, is Christopher – just today, is Christopher Rodriguez released to work?
> A      No.
> Q      Okay. So as we sit here today in this courtroom, he's not allowed to return to any type of employment true?
> A      Yes.
> Q      Okay. And I want to ask you some questions related to that. I understand – when is your next appointment to see him?
> A      I believe it's – I don't want to get the date wrong. It's March. I think it's probably March.
> Q      Okay. In March, what is the purpose of that appointment?
> A      A follow-up visit, his post-operative follow-up visit and to see how well his physical therapy has been going.
> Q      Okay. So in March you don't know if you'll be able to release him to work either?
> A      That is correct.
> Q      Okay. Just generally with this type of surgery, what you've seen in the medical records and what you follow as the treating surgeon for Christopher Rodriguez, are there any limitations you anticipate he will have in the future for his life with regards to working?
> A      So based on the work, the type of work that he usually does,

---

[2] Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997).

11

I understand it's heavy activity. We usually advise patients like that not to return to any heavy work activity.

Q        Okay. So you would be talking about specifics in regards to his job of climbing ladders, climbing stairs, carrying equipment, the job he did before, correct?

A        Yes.

Testimony continued through February 18, 2020, and the jury heard from several witnesses, including Rodriguez, Allen, Bashir, Pollock, and defense medical experts. The jury also heard from Kenneth McCoin, an economist who testified on behalf of Rodriguez with regard to his anticipated earning capacity. Do did not testify.

The jury ultimately found Harley Marine negligent and awarded Rodriguez $200,000 in past medical expenses, $20,000 in future medical expenses, $6,500 in past lost wages, and $40,000 in non-economic damages. It found the amount of Rodriguez's future lost wages to be zero. Rodriguez appeals.

DISCUSSION

Defense Counsel Misconduct

Rodriguez contends that reversal for a new damages trial is required because Harley Marine's counsel committed prejudicial misconduct at trial. We disagree.

A new trial is warranted based on counsel misconduct "where (1) the conduct complained of is misconduct, (2) the misconduct is prejudicial, (3) the moving party objected to the misconduct at trial, and (4) the misconduct was not cured by the court's instructions." Teter v. Deck, 174 Wn.2d 207, 226, 274 P.3d 336 (2012). Mere aggressive advocacy does not constitute misconduct, and reversal is warranted only if the misconduct is prejudicial in the context of the

entire record. Aluminum Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 539, 998 P.2d 856 (2000). The failure to object and request a corrective instruction constitutes waiver "unless it can be said that the misconduct was so flagrant, persistent and ill-intentioned, or its wrong so obvious and evil results so certain that the trial court's instruction to disregard it could not neutralize its effect." Nelson v. Martinson, 52 Wn.2d 684, 689, 328 P.2d 703 (1958).

Here, Rodriguez contends that defense counsel committed misconduct in three ways: (1) by questioning witnesses about their ties to Texas, their ties to Rodriguez's lawyers, or Rodriguez's Texas treatment; (2) by asking the jury to speculate during opening statement about the source of payments for Rodriguez's Texas treatment; and (3) by making accusations during closing about Rodriguez's attorney's involvement in procuring medical providers. Each is discussed below.

A. Questioning Witnesses about Texas

Rodriguez first argues that defense counsel committed misconduct by asking Rodriguez's witnesses about their ties to Texas and to Rodriguez's lawyers, and asking other witnesses to speculate about why Rodriguez would seek treatment in Texas. Rodriguez does not support this argument with references to the relevant parts of the record as required by RAP 10.3(a)(6). But we presume Rodriguez refers to the following instances, referred to in his recitation of facts, in which defense counsel either asked a witness about the witness's ties to Texas or to Rodriguez's lawyers, or asked the witness about

Rodriguez's Texas treatment:[3]

First, while cross examining Bashir, defense counsel asked, "Did you have any idea why a man from Vancouver, Washington would be in Houston, Texas seeking medical care?" Rodriguez's counsel objected on asked and answered grounds, and the court overruled that objection. Bashir then responded that he did not "know where the transition between Vancouver and Houston came from." On further questioning, Bashir confirmed he was familiar with Oregon Health Sciences University and the University of Washington Medical Center, and that he understood there are good spinal surgeons at both facilities.

Second, during cross-examination by defense counsel, Pollock confirmed that Rodriguez told Pollock that Rodriguez's attorney had referred Rodriguez to Do. Defense counsel also asked Pollock whether he asked Rodriguez "why this person from Vancouver, Washington was getting medical care in Houston, Texas." Pollock indicated he did and went on to explain that Rodriguez felt that the services he was receiving in Washington were not responsive, and Pollock "gathered from [his] conversation with [Rodriguez] that he had started searching for a law firm because he felt like the only way that he was going to be able to get any kind of help with getting the treatments that he needed was to find a good

_____

[3] Rodriguez refers generally to instances "listed above," but this vague reference to earlier sections of his brief is insufficient to comply with RAP 10.3(a)(6) because it places the burden on the opposing party and the court to determine which specific instances he believes support his argument. Thus, to the extent Rodriguez claims that additional instances of witness questioning support his argument that defense counsel committed misconduct, we deem them waived. Cf. In re Estate of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998) (court will not assume obligation to comb the record for evidence to support counsel's arguments).

attorney."

Third, during the direct examination of Dr. John Burns, a defense medical

expert, defense counsel questioned Burns as follows regarding the MRIs that Do

ordered:

> Q    Did you see any reason to have the MRI of the lumbar and thoracic spine given the presentation?
> A    Well, I can understand that this patient was up in arms over the fact that he never had an MRI back in Washington.  I can understand the position they were in that if they – if he was being sent for this evaluation, and he had already been scheduled to have an MRI in Washington, yes, they were going to go ahead and get a lumbar MRI.
> Q    Did it have any impact on his treatment?
> A    Well, in this case it did.
> Q    For his Texas doctors?
> A    They decided to operate on this.  This was considered to be a good candidate for surgery.
> Q    Did you think that was appropriate in the absence of radicular symptoms in his back?
> A    No.

Fourth, during the examination of Robert Reed, Rodriguez's supervisor at

Inspectorate, defense counsel asked Reed if he was aware that Rodriguez had

doctors in Texas.  Reed answered yes, and defense counsel then asked, "Did

you ever have a conversation with him on how come he was – how come he had

doctors in Texas . . . [o]r did he ever explain . . . why he had doctors in Texas?"

Reed responded, "He did not and I did not ask."

Fifth, while questioning Allen, defense counsel inquired as follows about

Allen's suggestion that Rodriguez have an MRI:

> Q     . . . [T]he MRI that you had earlier suggested, and that was a few weeks earlier.  Is that correct?
> A    At the 11/20 visit.
> Q    At the 11/20 visit, it was neither approved nor denied yet, correct?

15

A    Correct.  It was still in the review process.

Q    So I wanted to back up and just be clear about a couple of things.  It looks like it had been about a month and he was coming back to see you and he hadn't had the MRI.  Are you with me so far?

A    Correct.

Q    At that exam, did he ask you if you had the names for anybody he could go see independently to get an MRI?

A    Not to my recollection.

Q    Did he ask you if you knew of any doctors in Texas that you could refer him to?

A    No.

Q    Did he ask you if there was any radiologists in Texas that he can see and your recommendation?

A    No.

Q    He didn't ask you for any recommended doctors or radiologists anywhere, did he?

A    No.

Finally, while questioning Allen about the December 2018 visit at which Allen released Rodriguez back to work on a trial basis, defense counsel asked,

Q    Okay.  And at that point did Mr. Rodriguez ask you for a referral to any doctors or specialists or radiologists in Texas?

A    No.

Q    Did he ask you for any referral to any doctors, radiologists, or other specialists in Oregon or Washington?

A    No.

Q    As far as you know, he was going back to work on a trial basis, correct?

A    Correct.

Rodriguez contends that the foregoing questioning about Texas and Rodriguez's attorneys "was irrelevant and only pursued to prejudice Rodriguez." But the trial court ruled that because there was evidence that Rodriguez's attorneys had referred Rodriguez to Do, defense counsel could elicit testimony as to that fact.[4]  Accordingly, defense counsel did not commit misconduct by

---

[4] Rodriguez does not assign error to this ruling, nor does he argue that the trial court abused its discretion in so ruling.

16

eliciting Pollock's testimony that Rodriguez told him his attorneys had referred him to Do.  Cf. State v. Mireles, 16 Wn. App. 2d 641, 657, 482 P.3d 942 (2021) (not misconduct for prosecutor to elicit testimony that did not violate ruling in limine).  With regard to the rest of the questioning, Rodriguez did not object on relevance or ER 403 grounds, much less on the basis of misconduct.  Thus, Rodriguez failed to preserve any error premised on that questioning.

Rodriguez disagrees and contends that he "made his objections known before and during, to prevent the 'circus within the trial' over the location of and referrals between his lawyers and doctors."  In support of this contention, he points to arguments he made in connection with a motion in limine to exclude evidence that his doctors would get paid out of any settlement.  He also points to arguments he made in connection with his motion in limine to exclude evidence that Rodriguez's attorneys referred him to his doctors.  But neither of these motions asked the court to prohibit *all* questioning about Texas.  Furthermore, Rodriguez points to no authority for the proposition that merely moving in limine to exclude certain evidence is sufficient to preserve error premised on counsel misconduct (as distinct from evidentiary error).  Rodriguez's contention fails.

Rodriguez next contends he preserved error by "repeatedly ask[ing] to resolve evidentiary issues outside the jury's presence."  In support of this assertion, Rodriguez points only to an argument he made in opposition to defense counsel's request to examine *Rodriguez* as to who was paying his doctors.  But none of the questioning he now argues constituted misconduct was directed at Rodriguez.  Rodriguez's contention is unpersuasive.

17

Finally, Rodriguez suggests that his failure to object should be excused because the trial court's ruling on his motion to exclude evidence of attorney-doctor referrals was "vague." But the trial court's ruling was not vague: The court ruled that because there was evidence in the record that Rodriguez's law firm referred him to Do, defense counsel could elicit testimony as to that fact. The trial court reserved ruling with regard to doctors other than Do pending the presentation of evidence that Rodriguez's attorneys actually referred him to those doctors. Accordingly, to the extent Rodriguez believed that questioning about referrals other than to Do was objectionable, it was incumbent on him to object. See State v. Koloske, 100 Wn.2d 889, 896, 676 P.2d 456 (1984) ("When the trial court refuses to rule, or makes only a tentative ruling subject to evidence developed at trial, the parties are under a duty to raise the issue at the appropriate time with proper objections at trial."), overruled on other grounds, State v. Brown, 111 Wn.2d 124, 761 P.2d 588 (1988).

*B. Opening Statement*

Rodriguez next contends that defense counsel committed misconduct during his opening statement when he said, "And you may be wondering, who's paying for all this treatment in Texas?" He contends this was misconduct in that "[c]ounsel directed the jury to speculate that Rodriguez received money to pay for those treatments, . . . in violation of the court's ruling *in limine* and the general rule that collateral source evidence is improper at trial."[5]

---

[5] Rodriguez did not make a contemporaneous objection to this opening remark, but in a later colloquy, his counsel argued that the remark violated the

But contrary to Rodriguez's assertion, the trial court did not exclude *all* evidence regarding payments for Rodriguez's treatments. Rather, as the court later reminded Rodriguez's counsel, it ruled that to the extent it existed, evidence that Rodriguez's doctors would get paid out of any settlement or verdict would be admissible to show their bias.[6] Defense counsel did not violate the trial court's ruling during opening statement, and thus, Rodriguez fails to persuade us that defense counsel committed misconduct in his opening remarks. Cf. Andren v. Dake, 14 Wn. App. 2d 296, 300, 305, 472 P.3d 1013 (2020) (affirming trial court's order granting new trial based on attorney misconduct where attorney repeatedly violated trial court's rulings in limine).

## C. Closing Argument

Rodriguez next takes issue with a number of Harley Marine's arguments during closing. Rodriguez quotes each statement without the surrounding context. The relevant part of the argument is reproduced below, with emphasis added to the remarks Rodriguez claims constituted misconduct.

> Mr. Rodriguez said Dr. Do was the first person who listened to him, and I said that a minute ago. You saw Mr. Allen. He's an advocate for his patients. He was so careful with Mr. Rodriguez. They were listening.
> You were told during somebody's testimony . . . that Mr. Rodriguez didn't get to actually see an MD until he got to Houston.

---

trial court's ruling in limine about collateral source evidence. Accordingly, we consider this issue preserved for appeal.

[6] Rodriguez does not assign error to this ruling, and although he argues in footnotes that the ruling was erroneous inasmuch as it allowed for the admission of collateral sources to show bias, we decline to consider those arguments. Cf. State v. Johnson, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993) (declining to address issue raised in footnote and observing, "placing an argument . . . in a footnote is, at best, ambiguous or equivocal as to whether the issue is truly intended to be part of the appeal").

Remember that? Well, take a really close look at Exhibit 52. It is a medical report for the 20th of August, the second visit after the incident. And the person who provided services was Dr. Mark Damon, M.D. . . . And at that point, Mr. Rodriguez had mild back discomfort. There were no red flags in his exam.

And Mr. Rodriguez requested an MRI of his ankle. Dr. Damon makes that very clear, and Dr. Damon said this is a soft tissue injury; you don't need an MRI and that was precisely the correct decision. The ankle, as I said in my opening, plays almost no part in this case anymore.

But Mr. Rodriguez goes to Texas and he sees Dr. Do. She is a general practitioner. Not a specialist. All this I got to see a specialist, I got to see a specialist. *He goes to a GP. His lawyer sent him there.*

And she orders on the first day six MRIs: the head, the knee, the neck, the thoracic spine. . . . It's $35,000 day one on MRIs that he didn't need. And then her bill, you'll see in the exhibits, is about another $5,000. I told you in opening, they ran up $40,000 in medical bills the first day. It's in these exhibits.

How critical could this surgery have been, this back surgery? It wasn't scheduled until September, and he didn't have it until November. *Dr. Do brings in Drs. Bashir and Pollock, and with Dr. Cowen, this little cabal of doctors, it's like a little cottage industry down there in Texas. They do this time and time again.*

And speaking of Dr. Do, where was Dr. Do in this trial? You didn't hear from her.

Dr. Bashir, let me talk about him for a minute. It's really interesting to hear how people describe themselves. People who over-exaggerate themselves, I, at least, question what's going on here. So on direct, Dr. Bashir told you patients come from all over the country to see me. He would have you believe that he was the orthopedic version of the Mayo Clinic in Houston, Texas.

And on cross, we learned that 90 percent of his patients are either in litigation or with the worker's compensation system. I'll bet. *I'll bet there are lawyers from all over the United States who'd like their clients to see Dr. Bashir and get Dr. Bashir on the team.*

And he told you that the practice of medicine in Houston is, the – I think he said it's the largest medical center in the United States. If that's true, I didn't know it. He tried to make you think he is part of some big, grand medical practice in Houston, Texas. And then you learned on cross that he did this operation out of an eight-bed hospital.

*He's in the same group as Dr. Do. Fairly convenient. And he didn't even think to ask Mr. Rodriguez why are you here; what are you doing in Houston, Texas. He knew why. Of course he know why. The lawyers had sent him.* Chris Rodriguez told Dr. Bashir

20

previous physical therapy didn't help. We know that's wrong.
. . . .

And [Bashir] did admit that even a small incident can cause a herniated disc. You can get one of these bending over in the shower to pick up a bar of soap or sneeze, which I thought was a small incident, and he thinks it's a large incident.

*So we get to Dr. Pollock. He is a regular with this law firm.* Dr. Pollock was told by Mr. Rodriguez that Mr. Rodriguez had a loss of consciousness. There's that credibility bell again. It's not critical that he had a loss of consciousness, but that he's telling people he did is very important.
. . . .

*He didn't think to ask Mr. Rodriguez, what are you doing in Houston, because he knew too. He told you that his bill had been paid by this law firm, Arnold & Itkin.* I asked Mr. Rodriguez who was paying his medical bills, and I asked him about three providers: Bashir, Do, and Pollock. And he didn't directly answer that question once. The answer he gave pretty close to I am ultimately responsible for my medical bills. Same answer for all three doctors.

*Dr. Bashir didn't seem to know much about who paid him, but Dr. Pollock did. Dr. Pollock said he was paid by this law firm. Bless him for being honest about that. So I guess the answer I am not ultimately responsible for my bills, you can reasonably infer – because with Dr. Pollock it was the law firm who paid the bills, you can reasonably infer who's paying the bills.*

*And there's a reason for each one of those doctors to testify favorably for Mr. Rodriguez.*

Rodriguez contends that this argument constituted misconduct in that counsel "outright accused Rodriguez's lawyer of directing a 'cabal' of Texas professionals who ran a 'cottage industry' to embellish or fabricate personal injury cases." But Rodriguez did not object to any of these arguments, and for reasons already discussed, we are unpersuaded by Rodriguez's contentions that he preserved error via his motions in limine or his arguments thereon.

Furthermore, defense counsel's closing argument, even when considered together with the earlier witness questioning that Rodriguez claims was objectionable, was not flagrant misconduct such that Rodriguez did not have to

object to preserve error. Even a prosecutor in a criminal case has latitude to argue that a witness is not credible so long as the argument does not constitute a personal opinion and is based on the evidence. State v. Smith, 104 Wn.2d 497, 510-11, 707 P.2d 1306 (1985). Here, there was evidence—which the trial court ruled admissible—that Rodriguez's attorney referred him to Do. Additionally, Bashir testified that Do referred Rodriguez to him and that she refers a lot of patients to him. Bashir also testified that 65 percent of his patients are involved in litigation, 20 to 35 percent are involved in worker compensation claims, and that he had done more than 80 or 90 depositions in the last four years. He testified that he did not know how many of his patients had attorneys from the same law firm as Rodriguez, but that it was "[p]robably" more than five, "[p]otentially" fewer than 100, and he would not be surprised if it was more than 50.

Cowen testified that he had "probably done hundreds of depositions" and had worked on "over a hundred" cases for Rodriguez's attorney's firm "in over eight years." Pollock testified he worked with Rodriguez's attorney's firm "probably more than ten" times over the last 20 years. He also testified that Do "is one of the primary care providers who I've known for a good while and who sometimes refers patients to me." And, Pollock testified that Rodriguez's attorney's firm had paid his $4,000 fee to evaluate Rodriguez.

Given this evidence, defense counsel did not commit flagrant misconduct by arguing in the manner he did that Bashir, Pollock, and Cowen had an incentive to testify favorably for Rodriguez and may have been less than

thorough in their examinations, as demonstrated by the fact that they did not even ask Rodriguez why he was seeking treatment in Texas when he lived in Vancouver. Cf. State v. Russell, 125 Wn.2d 24, 92, 882 P.2d 747 (1994) ("The law allows cross examination of a witness into matters that will affect credibility by showing bias, ill will, interest, or corruption."). We do find disingenuous defense counsel's claim that he used the word "cabal" only to refer innocuously to a "group." Additionally, defense counsel argued facts not in evidence when he asked the jury to infer that doctors *other* than Pollock were being paid by Rodriguez's attorney's firm. Nevertheless, these remarks were not so prejudicial that a curative instruction would have been ineffective. For these reasons, Rodriguez waived any argument that defense counsel's closing argument constituted misconduct, whether considered alone or together with the earlier-discussed witness questioning to which Rodriguez also failed to object.[7]

---

[7] Because Rodriguez either did not establish that the witness questioning and counsel remarks he complains of constituted misconduct or failed to preserve error by objecting, we need not address Rodriguez's arguments that any alleged misconduct prejudiced him. We note, however, that the two Washington cases on which Rodriguez relies in support of his prejudice argument are not persuasive. In State v. Reed, the prosecutor "called the [defendant] a liar no less than four times," "stated that the defense counsel did not have a case, and that the [defendant] was clearly a 'murder two,' " and "implied that the defense witnesses should not be believed because they were from out of town and drove fancy cars." 102 Wn.2d 140, 145-56, 684 P.2d 699 (1984). And, "[d]efense counsel repeatedly objected, moved to strike and for a mistrial." Id. at 144. Here, by contrast, Rodriguez's counsel did not object, and defense counsel did not imply that Rodriguez's doctors were not credible merely because they were from Texas, but because there was evidence of their bias. And while our Supreme Court did order a new trial in Pederson v. Dumouchel, it did so based on its holding abandoning the "locality rule" with regard to the standard of care in medical negligence cases. 72 Wn.2d 73, 79, 431 P.2d 973 (1967). The court also disapproved of "the many occasions when defense counsel attempted to turn the jury into a hometown rooting section," but the full

Cf. Gilmore v. Jefferson County Pub. Transp. Benefit Area, 190 Wn.2d 483, 502-03 & n.4, 415 P.3d 212 (2018) (counsel's closing arguments painting defendant in a negative light, asking the jury to hold defendant responsible, and accusing defendant of fraud not so flagrant and ill-intentioned that no instruction could have cured the prejudice); Russell, 125 Wn.2d at 89 (although egregious, prosecutor's argument painting defendant as a serial killer who would go "hunting for a job" if jury acquitted him not sufficiently flagrant to warrant new trial).

Rodriguez disagrees and relies on Teter and Carabba v. Anacortes Sch. Dist. No. 103, 72 Wn.2d 939, 435 P.2d 936 (1967) to argue that defense counsel's misconduct was so flagrant that no objection was required to preserve error. But in Carabba, counsel *did* object to the claimed misconduct, and the issue on appeal was whether the claims of misconduct were nonetheless waived because although counsel objected, he did not specifically ask for the remedy of a *mistrial*. Carabba, 72 Wn.2d at 953. In Teter, counsel continued making speaking objections, putting unadmitted exhibits before the jury, and attempting to elicit testimony on subjects the trial court had ruled inadmissible or irrelevant—even after admonishments from the court. Teter, 174 Wn.2d at 213-15, 224-25.

Here, as discussed, Rodriguez did not object to the questioning or closing remarks he now claims were misconduct or seek any other remedy based on the alleged misconduct. And he does not point to any admonishments or other disapprovals from the trial court that would have put defense counsel on notice

---

details of those "many occasions" are not included in the opinion, and it is unclear whether the court believed that the misconduct would alone have warranted reversal. Id. at 83.

24

that his behavior was improper.  See Andren, 14 Wn. App. 2d at 316 ("While an objection is generally required to establish that misconduct supports a new trial order, in instances wherein the trial court itself interjects to disapprove of counsel's behavior, particularly in instances wherein the court has previously warned counsel to avoid such behavior, an objection is not always necessary." (citing Teter, 174 Wn.2d at 224-25)).  Instead, he waited until he received a less-than-satisfactory damages award to raise these issues on appeal.  Rodriguez's reliance on Carabba and Teter is misplaced.  Cf. Jones v. Hogan, 56 Wn.2d 23, 27, 351 P.2d 153 (1960) ("If misconduct occurs, the trial court must be promptly asked to correct it.  Counsel may not remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver . . . on appeal.").

Exclusion of Bashir's Testimony

Rodriguez argues that reversal is required because the trial court erred by excluding Bashir's testimony as to Rodriguez's future work restrictions.  Because Rodriguez's offer of proof with regard to Bashir does not establish that Rodriguez was prejudiced by the exclusion of Bashir's testimony, we disagree.

" '[E]videntiary error is grounds for reversal only if it results in prejudice.' " Bengtsson v. Sunnyworld Int'l, Inc., 14 Wn. App. 2d 91, 99, 469 P.3d 339 (2020) (quoting City of Seattle v. Pearson, 192 Wn. App. 802, 817, 369 P.3d 194 (2016)).  " 'An error is prejudicial if within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " Id. (internal quotation marks omitted) (quoting Pearson, 192 Wn. App. at 817)).

Rodriguez contends he was prejudiced by the exclusion of Bashir's testimony because without it, Harley Marine was "free to argue that [Rodriguez] presented no medical evidence to support his request for future wage loss." But even if Bashir had been permitted to testify consistent with Rodriguez's offer of proof, Bashir's testimony would not have been sufficient for a jury to find that Rodriguez would incur damages in the form of future lost wages.

Specifically, when Rodriguez's counsel conducted a voir dire of Bashir as an offer of proof, he specifically asked Bashir, "Just generally with this type of surgery, what you've seen in the medical records and what you follow as the treating surgeon for Christopher Rodriguez, *are there any limitations you anticipate he will have in the future for his life with regards to working*?" (Emphasis added.) Notably, Bashir did not respond in the affirmative. Instead he responded, "So based on the work, the type of work that he usually does, I understand it's heavy activity. *We usually advise patients like that not to return to any heavy work activity*." (Emphasis added.) Rodriguez's counsel then asked, "Okay. So you would be talking about specifics in regards to his job of climbing ladders, climbing stairs, carrying equipment, the job he did before, correct?" Bashir responded yes, and that was the extent of the offer.

Rodriguez's offer of proof establishes only that Bashir would have testified that he *usually advises* patients who do jobs like the one Rodriguez has not to return to those kinds of jobs. This is not the same as testimony that Bashir anticipated *Rodriguez himself* would have limitations in the future with regard to working. Indeed, to make the logical leap from what Bashir testified to during voir

26

dire to what Rodriguez would have a jury infer from that testimony, the jury would have had to speculate that the *reason* Bashir "usually advise[s]" patients not to return to "heavy work activity" is that patients are in fact unlikely to be able to perform that type of activity post surgery. Perhaps Bashir would have so testified had Rodriguez's counsel posed a follow-up question. But he did not, and "[w]e cannot assume that the witness could have answered the question, or what his answer would have been." Sutton v. Mathews, 41 Wn.2d 64, 68, 247 P.2d 556 (1952). For these reasons, Rodriguez fails to establish that the exclusion of Bashir's testimony prejudiced him. See Havens v. C & D Plastics, Inc., 124 Wn.2d 158, 169-70, 876 P.2d 435 (1994) ("The exclusion of evidence which . . . has speculative probative value is not reversible error."); cf. State v. Vargas, 25 Wn. App. 809, 817, 610 P.2d 1 (1980) (offer of proof "must be sufficient to advise the appellate court whether the party was prejudiced by the exclusion of the evidence").

Furthermore, even if Bashir had testified that Rodriguez would not likely be able to go back to his work as a gauger, Rodriguez does not point to any evidence that his future earning capacity was dependent on his ability to return to that line of work. Specifically, to support his prejudice argument, Rodriguez asserts that "[f]or a person with no college education like Rodriguez, jobs of a similar quality and pay are scarce." But he cites solely to McCoin's report to support this assertion, and the part of McCoin's report Rodriguez relies on not only was not admitted at trial, nothing in it suggests that jobs of a similar quality were "scarce" for someone with Rodriguez's level of education. Indeed, although

McCoin based his projections on Rodriguez's salary as a gauger, McCoin also testified that while he works regularly with vocational specialists who provide input on what jobs a person is capable of doing and will typically incorporate their input into his analyses, there was no input from a vocational specialist in Rodriguez's case.

Rodriguez also asserts he was prejudiced because McCoin's report showed Rodriguez's "expected lifetime earnings before and after the injury," and McCoin testified Rodriguez "lost out on $1.2 million dollars in potential income for the rest of his life." But this assertion mischaracterizes both McCoin's report and his testimony. McCoin calculated only what Rodriguez was anticipated to earn over his lifetime based on his pre-injury salary and estimated work life expectancy. He expressed no opinion as to what effect Rodriguez's fall had on his earning capacity.

In short, Rodriguez fails to establish that he was prejudiced by the exclusion of Bashir's testimony. Thus, reversal is not required.[8]

We affirm.

_Coburn, J._

WE CONCUR:

_Verellen, J._  _Dwyer, J._

---

[8] Because Rodriguez fails to establish he was prejudiced by the exclusion of Bashir's testimony, we need not consider whether a Burnet violation occurred or whether the trial court properly conducted its Burnet analysis.